# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No**. _____**

DENISH BHAVSAR and SAMHITA GERA, derivatively on behalf of

LIGHTNING EMOTORS, INC. (F/K/A GIGCAPITAL3, INC.),

      Plaintiff,

v.                                     JURY TRIAL DEMANDED

TIMOTHY R. REESER, TERESA P. COVINGTON,
AVI S. KATZ, RALUCA DINU,
NEIL MIOTTO, BRAD WEIGHTMAN,
ANDREA BETTI-BERUTTO,
PETER WANG, JOHN J. MIKULSKY,
ROBERT FENWICK-SMITH, BRUCE COVENTRY,
KENNETH JACK, THADDEUS SENKO, DIANA TREMBLAY
and GIGACQUISTIONS3, LLC,

      Defendants,

-and-

LIGHTNING EMOTORS, INC. (F/K/A GIGCAPITAL3, INC.),

a Delaware Corporation,

      Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

---

Plaintiffs Denish Bhavsar and Samhita Gera ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Lightning eMotors, Inc. ("Lightning" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Timothy R. Reeser ("Reeser"), Teresa P. Covington ("Covington"), Avi S. Katz ("Katz"), Raluca Dinu ("Dinu"), Neil Miotto ("Miotto"), Brad Weightman ("Weightman"), Andrea Betti-Berutto ("Betti-Berutto"), Peter Wang ("Wang"), John J. Mikulsky ("Mikulsky"), Robert Fenwick-Smith

("Fenwick-Smith"), Bruce Coventry ("Coventry"), Kenneth Jack ("Jack"), Thaddeus Senko ("Senko"), and Diana Tremblay ("Tremblay"), (collectively, the "Individual Defendants," and together with Lightning, the "Defendants"), and GigAcquistions3, LLC (the "Sponsor") for breaches of their fiduciary duties as directors and/or officers of Lightning, unjust enrichment, waste of corporate assets; abuse of control; for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and/or for the aiding and abetting thereof. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lightning, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Lightning's current and former directors and officers between May 18, 2020, and March 13, 2023 (the "Relevant Period").

2.    Lightning purports to build electric vehicle powertrains and provides electrification solutions for commercial fleets, including the revamping and conversion of traditional gas-powered vehicles to electric-powered vehicles. The Company is the result of a business combination that closed on May 6, 2021 (the "Merger") between Lightning Systems, Inc.

("Legacy Lightning") and GigCapital3, Inc. ("GigCapital3"), a shell company formed by the Sponsor, at the behest of GigCapital Global and GigFounders LLC (and through such entities, managing partners Defendants Katz and Dinu) with the only purpose of aggregating funds through an initial public offering ("IPO") and operating as a "Private-to-Public Equity" company.

3.    Unbeknownst to the shareholders who approved the Merger, the value of the Merger was not in line with Defendants' representations. In fact, through the Merger, GigCapital3 inherited a business that was close to non-operative and offered little in the way of financial growth or success. Indeed, Defendants successfully deceived the investing public into approving the Merger, and with it, lucrative arrangements that materially benefitted insiders at GigCapital3, including the Sponsor, and Legacy Lightning, to the Company's detriment. The truth remained hidden from investors until well after the Merger closed and the value of the Company's securities tanked to new lows.

4.    Prior to the Merger, GigCapital3 operated as a special acquisition company ("SPAC"). GigCapital3 was incorporated on February 3, 2020, as a blank check company formed for the purpose of effecting a merger, capital stock exchange, or similar business combination with one or more businesses. GigCapital3's most significant investor was the Sponsor, GigAcquisitions3 LLC, managed and controlled by Defendants Katz and Dinu.[1] Several of the Individual Defendants were direct or indirect members of the Sponsor.

5.    On May 13, 2020, GigCapital3 issued an aggregate of 20,000,000 units. The Sponsor purchased 650,000 units at $10.00 per unit for $6,500,000 (the "Private Placement Units"). Through the issuance of the Founder Units, the Sponsor, its affiliates, and the Sponsor's

---

[1] Defendants Katz is a serial SPAC sponsor; he now has multiple other SPAC offerings which currently trade for less than $2.00 per share following exaggerated and poor business combinations.

directors and officers collectively owned approximately 22.8% of GigCapital3's issued and outstanding units as of the date of the Merger Proxy (defined below).

6.    Before GigCapital's IPO, the Sponsor bought more than 5.7 million "founders' shares" of GigCapital3 for only $25,000 (the "Founder Shares"). On May 18, 2020, GigCapital3 completed its IPO, selling 20 million shares at $10 per share to public investors, enjoying proceeds of $200,000,000.

7.    Following the closing of GigCapital3's IPO, $202,000,000 of the net proceeds generated from the IPO and simultaneous private placement were placed in a trust account (the "Trust"), and these funds were to be released only upon the closing of a qualifying business combination, or in the case of liquidation, returned to GigCapital3's investors. The Trust was established to safeguard two key rights held by GigCapital3 shareholders under GigCapital3's amended and restated Certificate of Incorporation (the "Certificate of Incorporation"): (1) the redemption of 100% of the shares of common stock included in the units sold in the IPO in the event GigCapital3 is unable to timely complete the business combination; or (2) the redemption of the public shares in connection with a stockholder vote to amend the Company's amended and restated Certificate of Incorporation to modify the substance or timing of the Company's obligation to redeem 100% of its public shares if it did not timely complete its business combination.

8.    However, as certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placement Units, their financial interests were misaligned with those of GigCapital3 shareholders, and the post-Merger Company. These conflicts of interest only worsened once GigCapital3 determined it would complete a business combination with Legacy Lightning. Pursuant to GigCapital3's Certificate of Incorporation, GigCapital3 had only 18 months from the date of the IPO's closing, or until November 18, 2021, to complete a

business combination. This meant that, in the event GigCapital3 failed to complete a business combination by that time, GigCapital3 would have had to: (1) cease all operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to GigCapital3's investors. Because each of GigCapital3's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the $202 million Founder Shares and Private Placement Units would have been rendered worthless to them in the event GigCapital3 failed to timely complete a business combination.

9.      Driven by their strong motivations to avoid liquidation of the Trust and cash out on their investments, the Individual Defendants affiliated with GigCapital3 were highly motivated to facilitate a business combination with just about any company. In August 2020, Legacy Lightning approached GigCapital3 through a Bank of America Securities representative. At that time, Legacy Lightning, based out of Loveland, Colorado, was a cash-strapped company that only had two years of experience in designing and outfitting electric vehicles and struggled with production and supply chain issues.

10.     Nonetheless, by December 10, 2020, GigCapital3 announced an agreement with Legacy Lightning (the "Merger Agreement"), which provided that upon completion of the business combination, Legacy Lightning would become a wholly owned subsidiary of GigCapital3, GigCapital3 would rename itself Lightning eMotors, and GigCapital3 units, warrants, and common stock, then trading on the New York Stock Exchange ("NYSE") under the ticker symbols "GIK.U," "GIK.WS," and "GIK," would be relisted as "ZEV.WS" and "ZEV," with the units ("GIK.U") first being broken into their underlying securities. In this way, Legacy Lightning would become a publicly traded company without having to conduct a traditional IPO.

11.    In the registration statement and prospectus filed with the SEC on Form 424B3 for GigCapital3's IPO on March 22, 2021, GigCapital3 purported to describe itself differently than other SPACs in that GigCapital3 utilizes a "Mentor-Investor" approach "to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company." The registration statement and prospectus also highlighted GigCapital3's management team's "best practices and key learnings," stating that the management team's "deep relationships" in the technology sector and "know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination."

12.    The Individual Defendants courted investors to Legacy Lightning with this exact script. First, they touted Legacy Lightning as an ideal company for GigCapital3's "Mentor-Investor" approach. Second, they stated that Legacy Lightning was positioned for exponential growth in the future, stating that revenues would increase from $9 million in 2020 to $63 million in 2021 (a 600% year-over-year) to $354 million in 2022 (a 460% increase year-over-year). Additionally, the Individual Defendants alleged that Legacy Lightning's gross margin would increase from 3% in 2020 to 19% in 2022. Moreover, the Individual Defendants asserted they had "strong visibility" into these projections, citing Legacy Lightning's backlog of contracted orders which covered revenues extending into 2022.

13.    The Individual Defendants pushed investors on Legacy Lightning's tremendous upside in press releases, investor presentations, and in SEC filings until March 22, 2021, when GigCapital3 solicited the proxy statement on Form 424B3 pursuant to Rule 424(b)(3) asking that eligible shareholders vote to approve the Merger with Legacy Lightning, and among other things,

elect Defendants Katz, Dinu, and Miotto to the new Lightning Board for initial terms of three, two, and one years, respectively.

14.    The Merger closed on May 6, 2021, with Lightning securities trading on the NYSE the next day, on May 7, 2021.

15.    By the time the parties had entered into the Merger Agreement, the November 18, 2021 deadline for GigCapital3 to complete a business combination was fast approaching. Faced with the impeding deadline, the Individual Defendants had to act fast to both ensure that Gigcapital3 shareholders would approve the proposed Merger and dissuade them from redeeming their shares.

16.    To accomplish these goals, during the Relevant Period, certain of the Individual Defendants caused GigCapital3 and Legacy Lightning to tout a series of materially false and misleading statements and omissions regarding Legacy Lightning and the post-Merger business and prospects. These statements were made in SEC filings, press releases, interviews, and other public communications and misled the investing public about: (1) the capability of Legacy Lightning to meet revenue forecasts for 2021 and 2022; (2) the adequacy of the supply chain and production methods of Legacy Lightning; and (3) the authenticity and amount of purchase orders and product forecasts of Legacy Lightning.

17.    These matters directly impacted the Company's ability to output electric vehicles and its revenue projections, and as a result, the share price of the post-Merger Company's stock. Indeed, information regarding the true state of Legacy Lightning was material to GigCapital3 shareholders in deciding whether to redeem their shares of GigCapital3 stock or invest in the post-Merger Company. Even so, throughout the Relevant Period, the Individual Defendants misled GigCapital3 shareholders as to the true state of Legacy Lightning (and the potential benefits of

investing in the post-Merger Company) to garner shareholder approval for the Merger. Moreover, the Merger Proxy specifically also overstated Legacy Lightning's value through projections that remained drastically inflated, in spite of certain reevaluations, and misrepresented the value of GigCapital3's own shares given the impact of dilution.

18.    At this point in time, the Individual Defendants had the ability to correct the previous misstatements they caused to be issued to the investing public. The Individual Defendants could have provided GigCapital3 shareholders with complete and accurate information such that GigCapital3 shareholders could make fully informed decisions as to whether to sell their shares. However, because the Individual Defendants' financial interests conflicted with those of the GigCapital3 shareholders, they continued to conceal the material information regarding the state of Legacy Lightning from investors.

19.    As a result of the material misrepresentations and omissions made by the Individual Defendants in the Merger Proxy and statements leading up to the close of the transaction, shareholders were deceived into approving the unfavorable Merger instead of redeeming their initial investments, which were valued greater than any interest they later obtained in the Company, given the true value of the Legacy Lightning, and significant conflicts of interest which ultimately harmed the Company and its investors and squandered funds secured in the Trust (collectively, the "Overpayment Misconduct").

20.    The conflicts of interest that precipitated the Overpayment Misconduct, include, but are not limited to, the staggering personal financial gains received by the Individual Defendants because of the Merger. For instance, Defendant Reeser's compensation quadrupled due to the Merger; in 2020, Defendant Reeser received $336,000 from Legacy Lightning, while in 2021 he received $3.2 million from Lightning. Additionally, Defendant Reeser, Defendant Covington, and

Defendant Fenwick-Smith each received bonuses of $300,000, $70,000, and $50,000, respectively, after the closing of the Merger. But these amounts pale in comparison to the windfall Defendants Katz, Dinu, Miotto, Wang, Mikulsky, and Betti-Berutto (collectively, the "GigCapital3 Defendants") received from the Merger through the Sponsor. Since the Sponsor purchased the Founder Shares for just $25,000 approximately one year before the Merger, the Founder Shares after the Merger had a market value in excess of $39 million. Importantly, if the Merger did not close, the GigCapital3 Defendants would have received absolutely nothing in return for their investment. Likewise, all of the Defendants who served on Lightning's board after the Merger, including Defendants Katz, Dinu, Fenwick-Smith, Senko, Miotto, Coventry, and Tremblay all received large grants of Lightning restricted stock in the weeks after the Merger. And still further, the Defendants who served on the GigCapital3 board, who received Founder Shares, collectively received millions of dollars in profits from the closing of the Merger.

21.    The façade about Lightning began to emerge just five days after the Merger closed, on May 11, 2021, when the Lightning Board met and decided to reclassify the directorships of Defendant Katz, who then served as co-chairman of the Board, and Defendant Dinu, so that they would only need to serve a term of one year on Lightning's Board, instead of the three and two year terms they were elected to serve just days earlier in the shareholder vote. From this moment onward, Defendants abandoned their "Mentor-Investor" method.

22.    Then, just six days after the Board reclassified itself and just eleven days after the Merger closed, Lightning revealed that for the first quarter of 2021 ("Q1 2021"), Lightning made just 31 vehicles and only one powertrain kit of its projected 500 annual quota and had a whopping $27.4 million net loss for Q1 2021. In the release, the Company also reduced its revenue guidance for 2021 to between $50 million and $60 million, which was considerably less than the Merger

Proxy $63 million figure issued just weeks earlier. Lightning blamed the shortcomings on supply chain problems in Q1 2021 and forewarned that supply chain problems would "have a significant impact on short-term margin and operating costs." Nevertheless, the Individual Defendants maintained that "Lightning eMotors [was] well-positioned to achieve its 2021 forecast of over 500 purpose-built zero emission commercial vehicles," and able to handle any future "supply chain unpredictability."

23.     On June 17, 2021, during an "analyst day," Lightning's management repeated false representations about Lightning's "established network" of parts suppliers and manufacturing partners and how those entities were "making it easier to scale." The Company's management exuded confidence in Lightning's financial guidance as well.

24.     On August 4, 2021, based on already apparent misconduct of the Defendants, a class of GigCapital3 shareholders initiated the first of several securities class actions, against GigCapital3, Legacy Lightning, the Sponsor, and Defendants Katz, Dinu, Miotto, Mikulsky, Betti-Berutto, and Wang in the Court of Chancery of the State of Delaware alleging violations of breach of fiduciary duty and unjust enrichment (the "Chancery Class Action"). The complaint revealed significant facts about the Overpayment Misconduct and falsities contained in the Merger Proxy, designed to achieve support for the value-destructive Merger so that insiders could receive lucrative returns on their investments to the detriment of the post-Merger Company and its shareholders. The Company's position only worsened from there.

25.     After the markets closed for the day on August 16, 2021, Lightning revealed that due to "supply chain challenges," the Company only made 37 vehicles and powertrain systems during the second quarter of 2021 ("Q2 2021"). The Company also announced that it only had $10.5 million in revenue for the entire first half of fiscal year 2021.

26.     Further, Lightning revealed a first half of 2021 loss of $73.5 million and a net loss per share for Q2 2021 of $0.79. Additionally, Lightning's gross margin fell from -16% in Q1 2021 to -19% in Q2 2021. Lastly, Lightning revealed that Defendants Katz, Dinu, and Miotto, the three GigCapital3 members who were elected to the Board only months earlier and who reclassified the Board just after the Merger after pledging to follow their "Mentor-Investor" method, would not seek re-election to the Board in October 2021.

27.     After this devastating news came out, the Company's share price fell $1.63, to close at $8.00 per share on August 17, 2021. The share price fell 16.93%. Still, the full extent of Defendants' deception remained to be exposed.

28.     On October 15, 2021, another class of Lightning shareholders initiated the first of several securities class actions, which were later consolidated, in the United States District Court for the District of Colorado against the Company, Defendant Reeser, and Defendant Covington alleging violations of the Exchange Act (the "Federal Class Action").

29.     On January 4, 2023, Vice Chancellor Lori W. Wills denied defendants' motion to dismiss in the Chancery Class Action, holding that the GigCapital3 defendants had misled investors in connection with the Merger, including with respect to Legacy Lightning's growth revenue projections.

30.     However, the Defendants still strung investors along about other reasons for low revenues and low production numbers. On January 10, 2023, the Company issued a press release that attributed Lightning's woes to "unexpected" "battery supply issues" due to Romeo Power Systems, Inc. allegedly cancelling a contract for batteries with Lightning.

31.     In a similar shifty fashion, Lightning issued another press release intended to hype up investors the following day, on January 11, 2023, announcing that Lightning and Defendant

11

Reeser had won an award from the Business Innovation Group. In the press release, Defendant Reeser said it was an "honor" and put Lightning in the same category as IBM, Walgreens, PepsiCo, and Lucid.

32.    On March 13, 2023, the truth fully emerged when the Company released its 2022 financial performance, which fell significantly under its projections. Specifically, the press release announced that Lightning produced just 374 units in 2022, or just 5% of the sales that were projected during the Merger. Likewise, the Company' revenue was $24 million, or just 7% of the projected revenue of $354 million that was projected during the Merger.

33.    During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company and/or Legacy Lightning. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the PIPE and Notes financing significantly reduced the value of shareholders' shares due to the large number of warrants outstanding; (2) the Defendants were not planning on staying with the Company for the represented three to five year window; (3) Legacy Lightning did not have a supply chain strong enough to support ramped up production; (4) Legacy Lightning's supply chain and "vehicle performance" was not as reliable and not of the quality as Defendants represented;  (5) Legacy Lightning did not have the capacity to produce 500 vehicles a year; (6) in light of the foregoing, Legacy Lightning's financial projections were impossible to attain and patently unrealistic; and/or (7) Defendants were improperly interested in increasing their unjust compensation and their future compensation by seeking shareholder approval of the 2021 Equity Incentive Plan ("Incentive Plan"). As a result of

the foregoing, the Company's public statements were materially false and misleading at all relevant times.

34.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

35.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

36.    In light of the Individual Defendants' misconduct, which has destroyed the value of the Company, subjected the Company to costly investigations, the Chancery Class Action, and the consolidated Federal Class Action (and together with the Chancery Class Action, the "Class Actions")—which together also name Legacy Lightning's co-founder and former CEO, and GigCapital3's former board of directors as defendants—the Company has expended and will have to expend many millions of dollars.

37.    In light of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Individual Defendants' liability in the Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. R 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).

39.    Plaintiffs' claims also raise a federal question pertaining to the claims made in the Federal Class Action based on violations of the Exchange Act.

40.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

41.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

42.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and Lightning is headquartered in this District.

## PARTIES

### Plaintiffs

43.    Plaintiffs are current shareholders of Lightning common stock. Plaintiffs have continuously held Lightning common stock at all relevant times since first purchasing their shares on December 28, 2020, well before the Merger closed.

### Nominal Defendant Lightning

44.    Lightning is a Delaware corporation with its principal executive offices at 815 14th Street SW, Suite A100, Loveland, Colorado 80537. Lightning's common stock trades on the NYSE under the ticker symbol "ZEV" and "ZEV.WS"

### Defendant Katz

45.    Defendant Katz founded, manages, and with his spouse, Defendant Dinu, is the majority owner of GigAcquistions3, GigFounders LLC, and GigManagement LLC. He was the managing member of the Sponsor. Before the Merger, he served as CEO, President, Secretary, and chairman of the Board of GigCapital3.  After the Merger and until October 7, 2021, he served as

Co-Chairman of Lightning's Board. According to Lightning's proxy statement filed on Schedule 14A with the SEC on September 1, 2021 (the "2021 Proxy Statement"), as of August 23, 2021, Defendant Katz beneficially owned 5,015,713 shares of Company common stock. Given that the price per share of the Company's common stock was $151.60 when markets closed on August 23, 2021, Defendant Katz beneficially owned approximately $760,382,091 worth of Lightning stock as of that date.

46.     For the fiscal year ended December 31, 2021 ("2021 Fiscal Year"), Defendant Katz received $279,610 in compensation from the Company. This included $39,615 in fees earned or paid in cash and $239,995 in stock awards. Defendant Katz also received $30,000 quarterly in compensation for "advisory fees" from GigCapital3.

47.     The Company's Merger Proxy stated the following about Defendant Katz:

Dr. Avi S. Katz has served as our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary since February 2020. Dr. Katz has spent approximately 33 years in international executive positions within the TMT industry working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Katz has been instrumental in launching and accelerating entities, building teams, large scale fundraising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. In October 2017, Dr. Katz founded GIG1, a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the technology industry. GIG1 completed its initial public offering in December 2017, in which it sold 14,375,000 units at price of $10.00 per unit, with each unit consisting of one share of GIG1 common stock, three-fourths of one warrant to purchase one share of GIG1 common stock and one right to receive one-tenth of one share of GIG1 common stock, generating aggregate proceeds of $143,750,000, and, at that time, was listed on the NYSE under the symbol "GIG." On February 22, 2019, after intensive screening of more than 400 companies worldwide, GIG1 entered into a stock purchase agreement to acquire Kaleyra at a transaction enterprise value of $187 million with combined cash and/or promissory note consideration of $15 million. Kaleyra is a global company specialized in providing mobile messaging services for financial institutions and companies of all sizes. The transaction closed on November 25, 2019, and GIG1 was renamed Kaleyra, Inc. and listed on the NYSE American stock exchange under the symbol "KLR" at that time. Dr. Katz has served as the Executive Chairman and Secretary of Kaleyra, Inc. since the consummation of the

transaction in November 2019. Prior to that time, in addition to being the Executive Chairman and Secretary, he was also the Chief Executive Officer of GIG1. In March 2019, Dr. Katz founded GIG2. GIG2 completed its initial public offering in Junes 2019, in which it sold 17,250,000 units at a per unit price of $10.00, with each unit consisting of one share of GIG2 common stock, one warrant to purchase one share of GIG2 common stock, and one right to receive one-twentieth of one share of GIG2 common stock, generating aggregate proceeds of $172,500,000. GIG2 is listed on the NYSE under the symbol "GIX." GIG2 is engaged in intensive efforts of searching and screening companies worldwide, and has not yet completed its initial business combination. Dr. Katz serves as the Executive Chairman and Secretary of GIG2. Dr. Katz is also the sole managing member of GigFounders, LLC and a managing member of GigManagement, LLC. He is also the co-founder of Cognizer, a software company specializing in deep-learning powered natural language artificial intelligence, and was the Executive Chairman of Cognizer's board of directors from its inception in December 2018 until August 2020. Prior to GIG1 and GIG2, Dr. Katz dedicated 10 years to bootstrap, develop and manage GigPeak (NYSE American: formerly GIG), originally known as GigOptix, Inc. He served as Chairman of the Board, Chief Executive Officer and President of GigPeak. From its inception in 2007, which occurred through the acquisition of assets valued at less than $1 million, until its sale in April 2017 to IDT for $250 million in cash, GigPeak provided semiconductor integrated circuits (ICs) and software solutions for high-speed connectivity and video compression. While Dr. Katz was at GigPeak's helm, the company completed 10 M&A deals. From 2003 to 2005, Dr. Katz was the chief executive officer, president, and member of the board of directors of Intransa, Inc., which at the time provided full-featured, enterprise-class IP-based Storage Area Networks (SAN). From 2000 to 2003, Dr. Katz was the Chief Executive Officer and a member of the board of directors of Equator Technologies, which at the time sought to commercialize leading edge programmable media processing platform technology for the rapid design and deployment of digital media and imaging products. Equator Technologies was sold to Pixelworks, Inc. for $110 million in 2005. Dr. Katz has held several leadership positions over the span of his career within the technology industry since serving as Member of Technical Staff at AT&T Bell Laboratories in the 1980s, and has made numerous angel investments in high-tech companies around the world. Dr. Katz is a graduate of the Israeli Naval Academy and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion (Israel Institute of Technology). He is a serial entrepreneur, holds many U.S. and international patents, has published many technical papers and is the editor of a number of technical books. Dr. Katz is married to Dr. Dinu, one of our directors.

**Defendant Dinu**

48.     Defendant Dinu is Defendant Katz's spouse and business partner. Defendant Dinu is a founding managing partner of GigCapital Global, a managing member and majority owner of

GigFounders LLC, and a managing member of GigManagement LLC. She also served as a member of GigCapital3's Board until the Merger closed. After the Merger and until October 7, 2021, she served on Lightning's Board.

49.     For the 2021 Fiscal Year, Defendant Dinu received $259,803 in compensation from the Company. This included $19,808 in fees earned or paid in cash and $239,995 in stock awards. Before the IPO, Defendant Dinu received $30,000 quarterly in compensation for "advisory fees" from GigCapital3.

50.     The Company's Merger Proxy stated the following about Defendant Dinu:

> Dr. Raluca Dinu joined our Board of Directors in February 2020. She has served as the Chief Executive Officer of GIG2 since August 2019 and as a member of its board of directors since March 2019. From April 2017 to May 2019, Dr. Dinu was the Vice President and General Manager of IDT's Optical Interconnects Division. Prior to that, she held several executive-level positions at GigPeak, including Executive Vice President and Chief Operation Officer from April 2016 until it was acquired by IDT in April 2017, and before that, as its Executive Vice President of Global Sales and Marketing from August 2015 to April 2016, and as its Senior Vice President of Global Sales and Marketing from December 2014 to August 2015. From February 2014 to September 2017, Dr. Dinu was a member of the board of directors of Brazil-Photonics, in Campinas, Brazil, a joint venture that GigPeak established with the Centro de Pesquisa e Desenvolvimento em Telecomunicações (CPqD). From 2001 to 2008, Dr. Dinu was VP of Engineering at Lumera Corporation ("Lumera") (Nasdaq: LMRA). Lumera was acquired by GigPeak in 2008, and Dr. Dinu joined GigPeak at that time. Dr. Dinu holds a B.Sc. in Physics and Ph.D. in Solid State Condensed Matter Physics from the University of Bucharest, and an Executive-M.B.A. from Stanford University. Dr. Dinu is married to Dr. Katz, our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary.

**Defendant Miotto**

51.     Defendant Miotto served as a director of GigCapital3 from February 2020 until the Merger closed. During his service on the GigCapital3 board, Defendant Miotto served as the chair of the Audit Committee and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. After the Merger and until October 7, 2021, he served on

Lightning's Board. According to the 2021 Proxy Statement, as of August 23, 2021, Defendant Miotto beneficially owned 3,412 shares of Company common stock. Given that the price per share of the Company's common stock was $151.60 when markets closed on August 23, 2021, Defendant Miotto beneficially owned approximately $517,259 worth of Lightning stock as of that date.

52.    For the 2021 Fiscal Year, Defendant Miotto received $267,726 in compensation from the Company. This included $27,731 in salary and $239,995 in other compensation. Before the IPO, Defendant Miotto received $15,000 quarterly in compensation for "advisory fees" from GigCapital3.

53.    The Company's Merger Proxy stated the following about Defendant Miotto:

Neil Miotto joined the Board of Directors in February 2020. Mr. Miotto is a financial consultant and a retired assurance partner of KPMG LLP ("KPMG"), where he was a partner for 27 years until his retirement in September 2006. Since his retirement from KPMG, Mr. Miotto has provided highlevel financial consulting services to companies in need of timely accounting assistance and has served on public company boards. He is deemed to be a "audit committee financial expert" under SEC rules. While at KPMG, Mr. Miotto focused on serving large public companies. Mr. Miotto also served as an SEC reviewing partner while at KPMG. Mr. Miotto became a member of the board of directors of GIG1 in October 2017 and has continued in that role after that company became Kaleyra, Inc. Mr. Miotto has also served on the board of directors of GIG2 since March 2019. In addition, Mr. Miotto served on the board of directors of Micrel, Inc. prior to its sale to Microchip Technology Inc. in May 2015, and on the board of directors of GigPeak from 2008 until its sale to IDT in April 2017. He also previously served on the board of directors of Cognizer from March 2019 to August 2020. He is a member of the American Institute of Certified Public Accountants and holds a Bachelor of Business Administration degree from Baruch College of The City University of New York.

**Defendant Weightman**

54.    Defendant Weightman served as the CFO of GigCapital3 from February 2020 until the Merger closed. According to the Merger Proxy, Defendant Weightman was issued 5,000

common shares of GigCapital3 for future services before the IPO (the "Insider Shares"). He received compensation between $5,000 to $15,000 per month for serving as CFO.

55.     The Company's Merger Proxy stated the following about Defendant Weightman:

> Brad Weightman has served as our Chief Financial Officer since February 2020. Mr. Weightman has more than 30 years of global finance and accounting experience with a combination of large, mid-sized, and small public and private companies in the semiconductor, internet of things, hardware and software industries. Mr. Weightman has been the Chief Financial Officer of GIG2 since August 2019, and was also the Chief Financial Officer of GIG1 from that time until the closing of its business combination with Kaleyra, Inc. on November 25, 2019. Before then, beginning in April 2017, Mr. Weightman was Senior Business Controller at IDT, providing strategic and financial support for the General Manager and the division, prior to IDTI being acquired by Renesas Electronics Corp (TSE 6723:JP) in April 2019. Prior to GigPeak being acquired by IDT in April 2017, Mr. Weightman was Corporate Controller at GigPeak from September 2015 to April 2017. Before joining GigPeak, Mr. Weightman was self-employed as a financial consultant in 2015. Additionally, Mr. Weightman has held various finance and accounting positions at Echelon Corporation, an early developer of the internet of things market, supporting company growth from early stages to a mid-sized public company, as well as large corporations such as Advanced Micro Devices, Inc. and Xerox Holdings Corporation. Mr. Weightman received a Bachelor of Science degree in Accounting from San Jose State University, and is a Certified Public Accountant in California (inactive).

**Defendant Mikulsky**

56.     Defendant Mikulsky served as a director of GigCapital3 from February 2020 until the Merger closed. During his service on the GigCapital3 board, Defendant Mikulsky served as the chair of the Compensation Committee, as the chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. Defendant Mikulsky serves as a strategic advisor for GigCapital Global. Through this role, he has served on multiple SPACs and their post-merger entities created by Defendant Katz, including as a director of Kaleyra, Inc. and BigBear AI, Inc.

57.     The Company's Merger Proxy stated the following about Defendant Mikulsky:

John J. Mikulsky joined our Board of Directors in February 2020. Mr. Mikulsky became a member of the board of directors of GIG1 since December 2017 and has continued in that role after the company became Kaleyra, Inc. He joined the board of directors of GIG2 and the board of directors of Cognizer, in March 2019, serving on that company's board until August 2020. Mr. Mikulsky served as the Chief Executive Officer of Traycer Diagnostic Systems, Inc. from August 2016 to December 2017, and as a director, from October 2014 to December 2017. He previously served as President and Chief Executive Officer of Endwave Corporation (Nasdaq: ENWV) from December 2009 until June 2011, when Endwave Corporation was acquired by GigPeak; subsequent to such acquisition, he served on the board of directors of GigPeak from June 2011 until its sale IDT in April 2017. From May 1996 until November 2009, Mr. Mikulsky served Endwave Corporation in a multitude of capacities including Vice President of Product Development, Vice President of Marketing and Business Development and Chief Operating Officer. Prior to Endwave Corporation, Mr. Mikulsky worked as a Technology Manager for Balazs Analytical Laboratory, a provider of analytical services to the semiconductor and disk drive industries, from 1993 until 1996. Prior to 1993, Mr. Mikulsky worked at Raychem Corporation, most recently as a Division Manager for its Electronic Systems Division. Mr. Mikulsky holds a B.S. in electrical engineering from Marquette University, an M.S. in electrical engineering from Stanford University and an S.M. in Management from the Sloan School at the Massachusetts Institute of Technology.

**Defendant Betti-Berutto**

58.    Defendant Betti-Berutto served as a director of GigCapital3 from February 2020 until the Merger closed. During his service on the GigCapital3 board, Defendant Betti-Berutto served as a member of the Compensation Committee. He also currently serves as the Chief Technology Officer of Hardware for Defendant Katz's GigCapital Global company. According to the Merger Proxy, Defendant Betti-Berutto was issued 5,000 Insider Shares of GigCapital3 before the IPO.

59.    Defendant Betti-Berutto received $15,000 quarterly in compensation for "advisory fees" from GigCapital3.

60.    The Company's Merger Proxy stated the following about Defendant Betti-Berutto:

Andrea Betti-Berutto joined the Board of Directors as a director in February 2020. Mr. Betti-Berutto is a senior technologist and entrepreneur with more than 25 years of experience in Radio-Frequency and Optical Interconnect Systems and

20

Components and Radio-Frequency Integrated Circuit Semiconductor technologies. He has served as the Hardware Chief Technical Officer of GIG2 since August 2019 and as the Hardware Chief Technical Officer of the Company since February 2020. Mr. Betti-Berutto is not an officer or employee of GIG2 or the Company, and in each instance the title of Hardware Chief Technical Officer reflects Mr. Betti-Berutto's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. From April 2017 through June 2019, Mr. Betti-Berutto was the Fellow of Optical Interconnect Business Units at IDT, which was acquired by Renesas Electronics Corp (TSE 6723:JP) in 2019. Mr. Betti-Berutto joined IDT through the acquisition of GigPeak in April 2017, and he led the integration of the of GigPeak technical team into IDT. At GigPeak, he served as the Chief Technology Officer since April 2007 through the April 2017 acquisition by IDT. Previously, Mr. Betti-Berutto was Co-Founder of iTerra Communication, a pioneer in semiconductors for new generation 40G optical networks, where he served as VP of Engineering for RF and Optical Communication Product Development and as a member of the board of directors. After a reorganization of iTerra, he co-founded GigOptix (which was renamed GigPeak in April 2016) and, as Chief Technology Officer (CTO), led the growth of the company's technologies and product lines into the 100/200G optical market, mmWave transceivers for future 5G network deployment and transceivers for sensing application. Together with Dr. Katz and the rest of the GigPeak executive leadership team, Mr. Betti-Berutto drove the acquisition and integration of 10 companies and technologies. Before starting iTerra Communication, he worked for various companies in microwave system and devices for Basestation and Space Communication such as Fujitsu (USA), European Space Agency (Netherlands) and Space Engineering SpA (Italy). Mr. Betti-Berutto is a very hands-on executive with large experience in product/technology and business roadmap definition, strategic initiatives, company re-organization, product development and NPI processes. He has published multiple papers in IEEE journals and conferences and owns U.S. patents in the area of high-speed RF and Optical Integrated circuits. Mr. Betti-Berutto holds the degree of Electronic Engineer (MS) from University of Rome "La Sapienza" (Italy) with specialization in Electromagnetism.

**Defendant Wang**

61.    Defendant Wang served as a director of GigCapital3 from February 2020 until the Merger closed. During his service on the GigCapital3 board, Defendant Wang served as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Defendant Wang currently serves as Chief Technology Officer for Defendant Katz's GigCapital Global company.

62.    Defendant Wang received $6,000 quarterly in compensation for "advisory fees" from GigCapital3.

63.    The Merger Proxy stated the following about Defendant Wang:

Peter Wang joined the Board of Directors as a director in February 2020. Mr. Wang served as a member of the board of directors of GIG1 from December 2017 until its business combination with Kaleyra, Inc. in November 2019. He has served as the Software Chief Technical Officer of GIG2 since August 2019 and as the Software Chief Technical Officer of the Company since February 2020. Mr. Wang is not an officer or employee of GIG2 or the Company, and in each instance the title of Software Chief Technical Officer reflects Mr. Wang's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. He is a managing partner of Tekhill Catalyst LLC, a cross-border business strategy and technology transfer advisory service, since January 2018. He was a Managing Partner of Optino Network LLC from September 2016 through December 2017. He also serves on the Technology Advisory Council for Benhamou Global Ventures since April 2014. Mr. Wang previously served as the founding President of CoolCloudz, an Infrastructure-as-a-Service company, and the Sr. Vice President and General Manager of the Cloud Storage Products Business Unit of UIT, in China between 2010 and 2012. Mr. Wang co-founded Retrevo Inc., a venture funded Web 2.0 vertical search company employing machine learning technology, and served as the Vice President of Engineering and Operations and Board director between late 2005 and 2009. Mr. Wang led the founding of Intransa Inc. and served as the founding President and Chairman of the Board in late 2000. Intransa Inc. was a pioneer IP SAN company in the storage industry, backed by prominent Silicon Valley venture capital firms. Through his tenure at Intransa Inc. through mid-2005, Mr. Wang not only served as the CTO and a Board director, but also as Vice President of Engineering and Marketing, driving global strategic partnerships, at different stages. Prior to Intransa Inc., Mr. Wang led the corporate Technology Development Center at 3Com Corp. and served in various leadership positions from 1995-2000. While at 3Com, Mr. Wang spear-headed wide ranging technology investigations, prototyping, cross-division technology strategies, and strategic and university research partnership efforts, on VoIP, high-speed networks, broadband and wireless access, intelligent infrastructure, and network appliances. Prior to 1995, Mr. Wang led advanced development of distributed computing technologies at TRW Space & Defense and received TRW Chairman's Award for Innovation. Mr. Wang was instrumental in a number of IEEE 802, IETF and ANSI standards. He has been awarded over 20 U.S. patents and has published a number of IEEE conferences and other journal papers. He holds MS in Management Sciences from Stanford University, M.S. in EECS from U.C. Berkeley, and B.S. in Electrical Engineering from the University of Michigan.

**Defendant Fenwick-Smith**

64.    Defendant Fenwick-Smith currently serves and has served as a director on the Board of Lightning since October 7, 2021. Previously, he served as Legacy Lightning's co-chair of the Board and as the interim CFO from February 2020 until December 2020. He also currently serves as the chair of Lightning's Finance and Investment Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC on March 29, 2023 (the "2023 Proxy Statement"), as of March 17, 2023, Defendant Fenwick-Smith beneficially owned 806,263 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2023 was $6.40, Defendant Fenwick-Smith owned approximately $5,160,083 worth of Lightning stock as of that date.

65.    For the 2021 Fiscal Year, Defendant Fenwick-Smith received $354,610 in compensation from the Company. This included $64,615 in fees earned or paid in cash, $239,995 in stock awards, and $50,000 in all other compensation. For the fiscal year ending December 31, 2022 ("2022 Fiscal Year"), Defendant Fenwick-Smith received $207,291 in compensation from the Company. This included $86,250 in fees earned or paid in cash and $121,041 in stock awards.

66.    The Company's 2023 Proxy Statement stated the following about Defendant Fenwick-Smith:

> Mr. Fenwick-Smith has served as our Chair of the Board of Directors since October 7, 2021. Prior to that, he served as Co-Chair of the Board of Directors. From 2010 through the closing of the business combination on May 6, 2021, he served as Lightning Systems' Chair of the Board of Directors. From February 2020 through December 2020, Mr. Fenwick-Smith served as Lightning Systems' interim Chief Financial Officer. Mr. Fenwick-Smith founded Aravaipa Ventures in January 2008 and has served as senior managing director of Aravaipa Ventures since its inception. Mr. Fenwick-Smith has served as a member of the board of directors of Sionic Energy, Inc., a lithium-ion battery company, from 2021 to present; Clear Comfort Water, Inc., an industrial water treatment technology company, from 2014 to present; Bolder Industries, Inc., a sustainable rubber and plastic solutions company, from 2014 to present; and Silver Bullet Water Treatment, Inc., a water management company, from 2011 to present. Prior to founding Aravaipa Ventures, Mr. Fenwick-Smith worked in private equity in Europe for 20 years, during which

time his primary activity was serving as a founder and Chief Executive Officer of the Romaco Group from 1991 through 2002.

**Defendant Coventry**

67.    Defendant Coventry currently serves and has served as a director on the Board of Lightning since the Merger closed. Previously, he has served as a senior adviser to GigCapital Global, Defendants Katz's and Dinu's company, since the first quarter of 2020. He also currently serves as the chair of Lightning's Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of March 17, 2023, Defendant Coventry beneficially owned 48,825 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2023 was $6.40, Defendant Coventry owned approximately $312,480 worth of Lightning stock as of that date.

68.    For the 2021 Fiscal Year, Defendant Coventry received $280,380 in compensation from the Company. This included $40,385 in fees earned or paid in cash and $239,995 in stock awards. For the 2022 Fiscal Year, Defendant Coventry received $170,936 in compensation from the Company. This included $49,895 in fees earned or paid in cash and $121,041 in stock awards.

69.    The Company's 2023 Proxy Statement stated the following about Defendant Coventry:

> Mr. Coventry is currently the President of Coventry Consulting Group, an automotive consultancy focused on integrating technology-based startups into the complex processes of Global Automotive OEMs. Mr. Coventry has also served as a senior advisor to GigCapital Global, a leading automotive technology and business advisory board since the first quarter of 2020. Between March 2017 and December 2020, Mr. Coventry was managing partner of Motormindz, an automotive consulting group. From November 2015 to December 2016, Mr. Coventry was Chief Operating Officer of Android Industries, a private equity owned and world's largest assembler of automotive complex subassemblies and modules. Mr. Coventry has been a member of the board of directors of Canada Carbon Inc. (TSX.V: CCB), a natural resources company focused on the acquisition and development of graphite properties throughout Canada since August 2012. Mr.

Coventry also served as Chair of the board of directors of TowerSec Inc., an automotive cybersecurity software company that is a leading global solution vendor, specializing in delivering on-board cyber security software products to OEMs, suppliers and the aftermarket telematics manufacturers, beginning in August 2013 until the company's acquisition by Harman International Industries, Incorporated (at the time, a NYSE listed company) in March 2016. Mr. Coventry also currently serves on the Board of Trustees of Kettering University (formerly General Motors Institute), a position that he has held since 2001. Mr. Coventry has also run a Global Engine Joint Venture initiative for Chrysler, Hyundai and Mitsubishi, and previously served as President of Chrysler's Global Electric Motorcar.

### Defendant Jack

70.    Defendant Jack currently serves and has served as a director on the Board of Lightning since October 2021. He also currently serves as a member of Lightning's Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 17, 2023, Defendant Jack beneficially owned 37,716 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2023 was $6.40, Defendant Jack owned approximately $241,382 worth of Lightning stock as of that date.

71.    For the 2021 Fiscal Year, Defendant Jack received $163,291 in compensation from the Company. This included $15,190 in fees earned or paid in cash and $148,101 in stock awards. For the 2022 Fiscal Year, Defendant Jack received $169,791 in compensation from the Company. This included $48,750 in fees earned or paid in cash and $121,041 in stock awards.

72.    The Company's 2023 Proxy Statement stated the following about Defendant Jack:

Mr. Jack has served as Vice President of Verizon Communications Inc., leading fleet, mobility and supporting logistical services across the United States for its wholly owned subsidiaries since 2011. From 2006 through 2011, Mr. Jack served as General Manager of Consolidated Edison, Inc., where he was responsible for the acquisition, maintenance and operation of the specialized fleet of equipment operated by its wholly owned subsidiaries, Consolidated Edison Co. of New York and Orange & Rockland Utilities, as well as general management of its shared-services organization. From June 2020 through January 2023, Mr. Jack served on the Electric Vehicle Vision Advisory Board Of General Motors, Inc. From 1994

25

through 2006, Mr. Jack held various positions relating to maintenance, supply chain and utility infrastructure planning.

**Defendant Senko**

73.     Defendant Senko currently serves and has served as a director on the Board of Lightning since the Merger closed. He also currently serves as the chair of Lightning's Audit Committee and as a member of the Finance & Investment Committee. According to the 2023 Proxy Statement, as of March 17, 2023, Defendant Senko beneficially owned 48,825 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2023 was $6.40, Defendant Senko owned approximately $312,480 worth of Lightning stock as of that date.

74.     For the 2021 Fiscal Year, Defendant Senko received $290,072 in compensation from the Company. This included $50,077 in fees earned or paid in cash and $239,995 in stock awards. For the 2022 Fiscal Year, Defendant Senko received $184,791 in compensation from the Company. This included $63,750 in fees earned or paid in cash and $121,041 in stock awards.

75.     The Company's 2023 Proxy Statement stated the following about Defendant Senko:

> Mr. Senko is a retired partner from KPMG LLP, where he spent over 39 years providing enterprise risk management, compliance and audit services to various public companies. At KPMG, he served as Audit Partner and SEC Reviewing Partner for eight years, Chief Audit Executive for four years, Global and National Partner in Charge of Internal Audit, Risk & Compliance Services for eight years, Global Engagement Partner and Client Services Partner for seven years and Global Leader of the ESG practice for two years. Mr. Senko currently serves as a member of the board of directors and chair of the audit committee of Autoliv Inc.'s (NYSE:ALV), a supplier of automotive safety systems since 2018. In August 2021, Mr. Senko joined the board of directors, serving as chair of the audit committee, of USA Rare Earth LLC, a private company. Previously, Mr. Senko served on the board of directors of Duquesne University, a private university with approximately 10,000 students, from 2007 to 2016, chairing the audit and finance committee and serving on the executive and university advancement committee. Mr. Senko continues to serve on the university's Business Advisory Council.

**Defendant Tremblay**

76.    Defendant Tremblay currently serves as Lead Independent Director since June 2021 and has served as a director on the Board of Lightning since the Merger closed. She also currently serves as the chair of Lightning's Compensation Committee, as a member of the Finance & Investment Committee, and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 17, 2023, Defendant Tremblay beneficially owned 48,825 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2023 was $6.40, Defendant Tremblay owned approximately $312,480 worth of Lightning stock as of that date.

77.    For the 2021 Fiscal Year, Defendant Tremblay received $304,610 in compensation from the Company. This included $64,615 in fees earned or paid in cash and $239,995 in stock awards. For the 2022 Fiscal Year, Defendant Tremblay received $199,061 in compensation from the Company. This included $78,020 in fees earned or paid in cash and $121,041 in stock awards.

78.    The Company's 2023 Proxy Statement stated the following about Defendant Tremblay:

> Ms. Tremblay retired from General Motors Company, a multinational motor vehicle manufacturer and distributor (NYSE: GM), in September 2017. She had been with GM since 1977, and during her tenure, she held a variety of positions in engineering, manufacturing and labor relations, including direct operational responsibility for over 50,000 employees. From July 2013 until her retirement, Ms. Tremblay served as Vice President of Global Business Services, where she was charged with streamlining administrative processes around the world to improve service quality, reduce complexity, and achieve cost efficiencies in such areas as finance, human resources, real estate, purchasing, asset management and master data. From December 2009 to July 2013, Ms. Tremblay held the position of Vice President of Manufacturing at GM.

**Defendant Reeser**

79.     Defendant Reeser is the founder of Legacy Lightning (which was then called Lightning Hybrids), currently serves as CEO since October 2012 and as a director on the Board of Lightning since the Merger closed. According to the 2023 Proxy Statement, as of March 17, 2023, Defendant Reeser beneficially owned 48,825 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2023 was $6.40, Defendant Reeser owned approximately $312,480 worth of Lightning stock as of that date.

80.     For the 2021 Fiscal Year, Defendant Reeser received $3,262,828 in compensation from the Company. This included $390,385 in salary, $300,000 in bonuses, $1,250,001 in stock awards, $1,310,807 in stock options, and $11,635 in all other compensation. For the 2022 Fiscal Year, Defendant Reeser received $2,943,396 in compensation from the Company. This included $500,000 in salary, $1,212,872 in stock awards, $1,213,543 in stock options, and $16,981 in all other compensation.

81.     The Company's 2023 Proxy Statement stated the following about Defendant Reeser:

> Mr. Reeser founded Lightning eMotors (founded under the name Lightning Hybrids in October 2008). Since October 2012, he has served as Lightning Systems' Chief Executive Officer. He continues in this role at Lightning eMotors today and has also served as a member of the Board of Directors since the inception of Lightning Hybrids, and now Lightning eMotors, since the closing of the business combination on May 6, 2021. Mr. Reeser has also served as Managing Partner of Aravaipa Ventures from August 2011 to present. From January 2009 through October 2012, Mr. Reeser served as Vice President of CSU Ventures, the tech transfer arm of Colorado State University. Mr. Reeser has been a senior technology executive, entrepreneur and venture investor in the transportation technology, clean tech and software space for over 25 years. He is adept at building international executive management teams and growing companies organically and through mergers and acquisitions.

**Defendant Covington**

82.     Defendant Covington served as Senior Vice President and CFO of Lightning from 2021 until October 2, 2022. According to the Company's proxy statement filed on Schedule 14A with the SEC on June 14, 2022 (the "2022 Proxy Statement"), as of June 2, 2022, Defendant Covington beneficially owned 126,423 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 2, 2022 was $81.60, Defendant Covington owned approximately $10,316,117 worth of Lightning stock as of that date.

83.     For the 2021 Fiscal Year, Defendant Covington received $1,514,293 in compensation from the Company. This included $343,269 in salary, $120,000 in bonuses, $600,001 in stock awards, $440,159 in stock options, and $10,864 in all other compensation. For the 2022 Fiscal Year, Defendant Covington received $1,030,185 in compensation from the Company. This included $269,231 in salary, $70,000 in bonuses, $679,211 in stock awards, and $11,743 in all other compensation.

84.     The Company's 2022 Proxy Statement stated the following about Defendant Covington:

> **Teresa Covington.** Ms. Covington has served as Lightning Systems' Senior Vice President and Chief Financial Officer since January 2021 and continues in those roles at Lightning eMotors. She previously served as the Senior Vice President and Chief Financial Officer of asTech, a cloud-based technology and diagnostic automotive services platform from October 2019 until the end of 2020. From March 2017 through October 2019, Ms. Covington served as the Senior Vice President and Chief Financial Officer of AeroVironment Inc., a technology leader in unmanned systems for defense and commercial markets. She previously served as AeroVironment's Vice President of Finance from July 2015 to March 2017 and as interim Chief Financial Officer from February 2015 to July 2015. Prior to joining AeroVironment, from August 2000 to May 2011, Ms. Covington served as Senior Vice President and Chief Financial Officer of Line 6, Inc., a global designer and manufacturer of musical instruments that is now part of Yamaha. Ms. Covington earned an MBA from Stanford University Graduate School of Business, an M.S. in electrical engineering from the University of Southern California and a B.S. in electrical engineering from the University of Illinois at Urbana-Champaign.

**The Sponsor**

85.     The Sponsor is a Delaware limited liability company that served as the sponsor of
GigCapital3 leading up to the Merger and is affiliated with several of the Individual Defendants.
The Sponsor and its affiliates collectively owned over 20% of the Company's common stock and
were conflicted in the Merger given their investments into GigCapital3, which would be rendered
worthless without a business combination.

86.     Defendants Katz and Dinu were the two managing members of the Sponsor at all
relevant times.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

87.     By reason of their positions as officers, directors, and/or fiduciaries of the Company
and because of their ability to control the business and corporate affairs of the Company, the
Individual Defendants owed the Company and its shareholders fiduciary obligations of trust,
loyalty, good faith, and due care, and were and are required to use their utmost ability to control
and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants
were and are required to act in furtherance of the best interests of the Company and its shareholders
so as to benefit all shareholders equally.

88.     Each director and officer of the Company owes to Lightning and its shareholders
the fiduciary duty to exercise good faith and diligence in the administration of the Company and
in the use and preservation of its property and assets and the highest obligations of fair dealing.

89.     The Individual Defendants, because of their positions of control and authority as
directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise
control over the wrongful acts complained of herein.

90.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

91.     Each Individual Defendant at GigCapital3 leading up to the Merger, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

92.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at GigCapital3 had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common

stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

93.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to Lightning's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with

all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

94.     Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

95.     At all times relevant hereto, the Individual Defendants at GigCapital3 were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

96.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

97.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

98.     In committing the wrongful acts alleged herein, the Individual Defendants and the Sponsor have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and the Sponsor caused the Company to conceal the true facts as alleged herein. The Individual Defendants and the Sponsor further aided and abetted and/or assisted each other in breaching their respective duties.

99.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' and the Sponsor's violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and violations of Section 14(a), 10(b) and 21D of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

100.    The Individual Defendants and the Sponsor accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and the Sponsor collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of GigCapital3's board of directors and Legacy Lightning's board of directors, each of the Individual Defendants, who

was a director of GigCapital3 or Legacy Lightning, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

101.    Each of the Individual Defendants and the Sponsor aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and the Sponsor acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

102.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company or Legacy Lightning and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT, AUDIT COMMITTEE CHARTER AND CORPORATE GOVERNANCE

### *GigCapital3's Code of Ethics*

103.    GigCapital3's's Code of Ethics of GigCapital3, Inc. ("Code of Ethics") begins by stating it is "applicable to all of the Company's directors, officers and employees" and was adopted to:

- promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- promote the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "***SEC***"), as well as in other public communications made by or on behalf of the Company;
- promote compliance with applicable governmental laws, rules and regulations;
- deter wrongdoing; and

35

- require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

104.    The Code of Ethics states that "[e]ach person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair and candid. Deceit, dishonesty and subordination of principle are inconsistent with integrity." It also provides that "[s]ervice to the Company should never be subordinated to personal gain and advantage."

105.    In a section titled "Honest, Ethical and Fair Conduct," the Code of Ethics provides that "each person must":

- Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or when in the Company's interests;

- Observe all applicable governmental laws, rules, and regulations;

- Comply with the requirements of applicable accounting and auditing standards, as well as Cmpany policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data;

- Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices;

- Refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice;

- Protect the assets of the Company and ensure their proper use;

106.    The Code of Ethics, under "Disclosure," provides that GigCapital3 "strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate."

107.    The Code of Ethics, under "Compliance," provides that it is GigCapital3's "obligation and policy to comply with all applicable governmental laws, rules and regulations. All directors, officers and employees of the Company are expected to understand, respect and comply with all of the laws, regulations, policies and procedures that apply to them in their positions with the Company. Employees are responsible for talking to their supervisors to determine which laws, regulations and Company policies apply to their position and what training is necessary to understand and comply with them."

### *Lightning Code of Conduct*

108.    The Lightning Code of Conduct states that the "purpose" of the Code of Conduct "is to confirm the commitment of Lightning eMotors, Inc. and its subsidiaries (the "Company") to conduct its and their affairs in accordance with the highest standards of integrity."

109.    The Code of Conduct also states under the "Purpose" section that "[j]ust as the Company has a responsibility to conduct its business in strict compliance with all applicable laws and regulations, so too it expects its employees, officers and directors to act in accordance with the highest standards of business ethics both on and off Company premises, and to avoid any appearance of impropriety."

110.    The Code of Conduct further states in the same section that "…we, as employees, officers and directors, share in the responsibility of developing and maintaining the honesty and integrity of our Company."

111.    In the same section, the Code of Conduct outlines several requirements that all employees, officers, and directors "must" do:

- comply with applicable laws, rules, and regulations;

- conduct all dealings with the Company's customers, suppliers and competitors fairly, with honesty and integrity;

- ethically handle conflicts of interest, both real and perceived, in personal and professional relationships;

- produce, or cause to be produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission (the "SEC") and in other public communications;

- protect information, in any form, that belongs to the Company, its customers and suppliers;

- protect the Company's assets and ensure their efficient use and report any suspected incident of fraud or theft immediately; and

- never use your position with the Company or Company assets or information for improper personal gain.

112.    In the same section, the Code of Conduct states that all employees, officers, and directors "must report potential or actual violations of this Code."

113.    Under a section titled, "Lawful and Ethical Behavior," the Code of Conduct stated that is Lightning's policy "you conduct business in accordance with applicable federal, state and local laws, rules and regulations and with the laws, rules and regulations of other countries in which the Company does business. In addition, the Company's policy demands that you adhere to the highest standard of business ethics and conduct."

114.    Under a section titled, "Ethical Standards," the Code of Conduct provides that employees, officers, and directors "must":

- Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships. You should recognize that even the appearance of a conflict of interest can damage the Company. A conflict of interest may exist because of a relationship of an employee or of a family member that is inconsistent with the Company's best interests or could cause a conflict with the employee's ability to perform his or her job responsibilities.

- Promptly report to your manager, an executive officer or the above-named Board Representative any transaction that reasonably could be expected to give rise to a conflict of interest.

- Produce, or cause to be produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the SEC and in other public communications.

- Comply with applicable laws, rules and regulations.

- Promptly report any violation of this Code to your manager, an executive officer or the above-named Board Representative.

- Proactively promote ethical behavior by other Company officers and employees involved in financial reporting.

115.    Under a section titled, "Accounting and Financial Integrity, Fraud and Improper Payments," the Code of Conduct states that "the Company requires full, fair, accurate, timely and understandable recording and reporting of all Company information."

116.    In the same section, the Code of Conduct states with emphasis that "[*i*]*t is very important that you do not create, or participate in the creation, or perpetuation of, any records that are intended to mislead anyone or conceal any improper act or conduct.*"

117.    In the same section, the Code of Conduct provides that Lightning "[e]nsure the financial statements and related disclosures include all information deemed necessary to achieve an appropriate degree of transparency of business transactions."

118.    Under a section titled, "Compliance with the Code," the Code of Conduct provides that the "Board of Directors has retained the ultimate responsibility for overseeing compliance with all applicable laws, governmental regulations and policies, the Code and all other related Company policies and procedures, and has appointed the above-named Board Representative to serve as the point person for communicating with the Board of Directors with regard to such compliance matters."

119.    In the same section, the Code of Conduct provides that "[i]t is the responsibility of all employees, officers and directors to comply with all applicable laws, regulations, governmental policies, the Code and the Company's related policies and procedures. It is the responsibility of all Company supervisory personnel to monitor compliance with this Code. The Board of Directors will periodically review for compliance with the Company's policies and procedures."

### Audit Committee Charter

120.    The Lightning eMotors, Inc. Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

121.    Per the Audit Committee Charter, the Audit Committee's purpose is to "assist the Board of Directors of the Company in monitoring and overseeing" the following:

- The integrity of the Company's financial statements;

- Compliance with legal and regulatory requirements;

- The Company's independent registered auditors' qualifications and independence;

- The performance of the Company's independent registered auditors;

- The design and implementation of the Company's internal audit function.

122.    The Audit Committee Charter lists the Audit Committee's responsibilities, a few of which are:

- At least annually, evaluate the qualifications, performance and independence of the Company's Independent Auditors, including an evaluation of the lead audit partner, and to assure the regular rotation of the lead audit partner at the Company's Independent Auditors and consider regular rotation of the accounting firm serving as the Company's independent auditor.

- Meet to review and discuss with management and the Independent Auditor the results of the annual audit, the audited financial statements, unaudited quarterly financial statements of the Company, any comments or recommendations of the Independent Auditor, any reports of the Independent Auditor with respect to interim financial reviews as required by applicable PCAOB standards and the specific disclosures in "Management's Discussion and Analysis of the

Financial Condition and Results of Operations" presented in the Company's Form 10-K and 10-Q filings.

- Review and discuss with the Company's Independent Auditor all critical accounting policies and practices to be used in the audit; all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditors; and other material written communications between the auditors and management.

- Recommend to the Board, based on the review and discussions noted above, whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for filing with the SEC; and to produce the report of the Committee required to be included in the Company's proxy statement.

- Review and discuss with management the risks faced by the Company and the policies, guidelines, processes and reports on the Company's programs for assessing and managing the Company's risks, and oversee the steps management has taken to monitor and control such risks, including those related to financial reporting, environmental and litigation matters, safety, and compliance.

- Review with the CEO, CFO, senior internal audit executive and Independent Auditor the Company's policies and procedures for maintaining the adequacy and effectiveness of internal controls and disclosure controls procedures. As part of this effort, the Committee will inquire of the CEO, CFO, senior internal audit executive and Independent Auditor about controls the CEO, CFO and senior internal audit executive has implemented to minimize significant risks to the Company and the effectiveness of these controls. In addition, on an annual basis, discuss with the independent auditor the auditor's consideration of fraud during the performance of financial statement audits.

- Review, and oversee the Company's Related Party Transaction Policy and Procedures, approve or ratify certain transactions as prescribed by the policy, and oversee procedures for administering and promoting compliance with the policy on an ongoing basis.

- Oversee the Company's compliance program with respect to legal and regulatory requirements and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the chief legal officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Company's Code of Business Conduct and Ethics, including any matters involving criminal or potential criminal conduct.

123.    In violation of the GigCapital3 Code of Ethics, the Lightning Code of Conduct, the Audit Committee Charter, the Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' and the Sponsor's violations of law, including but not limited to breaches of fiduciary duty by engaging in or effectuating the Overpayment Misconduct and violations of Section 14(a) of the Exchange Act. Also in violation of GigCapital3's and Lightning's corporate governance documents, the Defendants failed to maintain the accuracy of GigCapital3 and Lightning reports and other documents filed with the SEC, comply with laws and regulations, conduct business in an honest and ethical manner, ensure the efficient and responsible use of GigCapital3's and Lightning's assets and resources by GigCapital3 and Lightning, and oversee the integrity of financial information provided by GigCapital3 and Lightning to their shareholders, the public, and any stock exchange.

124.    The Individual Defendants who were at the Company before and after the Merger conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty and violations of Section 14(a) of the Exchange Act. Also in violation of the Company's corporate governance documents, the Individual Defendants who were at the Company before and after the Merger failed to maintain the accuracy of Company records and reports, comply with laws and regulations, oversee the integrity of the Company's financial statements, and maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Background of GigCapital3*

42

125.    GigCapital3 was incorporated in Delaware on February 3, 2020, as a special purpose acquisition company (i.e., a SPAC) formed for the purpose of effecting a merger, capital stock exchange, or similar business combination with one or more businesses. It was managed by the Sponsor, which was an affiliate of GigCapital Global, a self-described private-to-public equity business that brings "private companies to the public market with an 'IPO-in-a-box' methodology." Defendant Katz is the CEO, Executive Chairman, and a founding manager partner of GigCapital Global.

126.    Defendant Katz was a member of GigCapital3's board of directors, and served as its Executive Chairman, Secretary, President, and CEO. He also held a controlling interest in the Sponsor and was the Sponsor's managing member. Consequently, Defendant Katz, through the Sponsor, personally chose Defendants Dinu[2] (who is his spouse), Miotto[3], Mikulsky[4], Betti-

[2] For instance, Defendant Dinu is a founding managing partner of GigCapital Global. She served as a director of GigCapital2, Inc. (another SPAC) since March 2019 and continued in that role with UpHealth, Inc. (the post-merger company), serving as its CEO from August 2019 until June 2021 (Defendant Katz is the Chairman of the Board of UpHealth, Inc.) Defendant Dinu also acts as the CEO and as a director of GigCapital4, Inc. and continues in both of those roles with Big Bear AI, Inc. (post-SPAC), GigCapital5, Inc., and GigInternational1, Inc. (all SPACs). Defendant Dinu also has served as an executive at GigPeak, Inc., which is a company that Defendant Katz founded and managed, from 2008 until its sale in 2017.

[3] Defendant Miotto is a GigCapital Global partner. He served as a director of GigCapital1, Inc. (another SPAC) and is a director of the post-SPAC company, Kaleyra, Inc. (Defendant Katz currently serves as the Chairman of the Board and Defendant Mikulsky serves as a director of Kaleyra, Inc. as well). Defendant Miotto also served as a director of GigCapital4 before it merged with BigBear AI, Inc.

[4] Defendant Mikulsky is a GigCapital Global strategic advisor, served as director of GigCapital1, and currently serves as a director of Kaleyra. Previously, he served as the CEO and President of Endwave Corporation, a company bought by GigPeak in 2011. After his tenure as CEO, he served as a director of GigPeak until its sale in 2017. Defendant Mikulsky also served as a director of GigCapital2 until it merged with UpHealth, Inc. in 2021.

Berutto[5], and Wang[6] to GigCapital3's board of directors. All these GigCapital3 Defendants have previous connections to Defendant Katz, are linked with GigCapital Global, and hold and have held many roles at GigCapital Global's assortment of businesses over the years.

127.    In February 2020, soon after incorporation, GigCapital3 issued 4,985,000 Founder Shares to the Sponsor, which came to approximately 20% of GigCapital3's post-IPO equity, for the nominal sum of $25,000. The Founder Shares were fundamentally different from the common shares that would later be offered to the investing public during GigCapital3's IPO in that the Founder Shares could not be redeemed for cash and did not enjoy liquidation rights. Additionally, Founder Shares were subject to a lock-up provision that barred the Sponsor from transferring, assigning, or selling Founder Shares until a designated time. As directors of GigCapital3, Defendants Dinu, Miotto, Betti-Berutto, and Wang all held an undisclosed membership interest in the Sponsor, which in turn held GigCapital3's Founder Shares. Additionally, Defendants Wang and Betti-Berutto were each handed 5,000 Insider Shares.

128.    GigCapital3 held its IPO on May 18, 2020, selling 20 million units to the investing public for $10.00 per unit, raising $200 million in proceeds. Each unit consisted of a share of common stock and three-quarters of a warrant to purchase a share of common stock at an exercise price of $11.50 per share.[7] The common stock shares had redemption and liquidation rights. Specifically, if GigCapital3 failed to complete a business combination within 18 months of

---

[5] Defendant Betti-Berutto is GigCapital Global's Chief Technology Officer of Hardware. He co-founded GigPeak and served as its CTO until its 2017 sale. He also has served as a director of GigCapital4 and GigInternational1.

[6] Defendant Wang is GigCapital Global's Chief Technology Officer of Software and serves as a director of GigCapital6, Inc. and GigInternational1. He also served as a director of GigCapital1 from November 2017 until it merged with Kaleyra in 2021.

[7] For instance, if an investor purchased four units, it would allow the investor to purchase three common shares at $11.50 per share in the future.

incorporation, GigCapital3 would liquidate, and public shareholders would receive $10.00 per share back with interest. If GigCapital3 found a target company, public shareholders had the option to redeem their shares for $10.00 per share plus interest but retain the warrants included in the IPO units.[8]

129.    During the IPO, the Sponsor bought 650,000 GigCapital3 units for $10.00 per unit in a private placement. The proceeds of this private placement, in the amount of $6.5 million, went towards GigCapital3's underwriting fees and operating costs. Additionally, the IPO underwriters bought 243,479 private placement units for $10.00 per unit. Like the aforementioned public IPO units, these private placement units were composed of a share of common stock and three quarters of a warrant to purchase a share of common stock and were subject to a lock-up provision. However, in contrast to the public IPO units, the private placement units as well as the Insider Shares given to Defendants Betti-Berutto and Wang, did not enjoy liquidation or redemption rights.

130.    The $200 million in proceeds from the IPO was put into the Trust, which required that the shares be redeemed in the first instance, contributed to a merger, or returned to shareholders in the event of liquidation. Nomura Securities International, Inc. ("Nomura") and Oppenheimer & Co. Inc. ("Oppenheimer") were the lead managers for the offering, with Odeon Capital Group LLC as co-manager. The underwriters deferred two thirds, or approximately $8 million, of their underwriting fees until a business combination was achieved.

131.    Throughout the Relevant Period, the Individual Defendants associated with GigCapital3 represented themselves to the investing public as having substantial experience in identifying targets and acquiring businesses. In particular, the Individual Defendants touted their

---

[8] Warrants became exercisable after the Merger closed on May 6, 2021.

investment experience and network of relationships, along with their "unique" hands-on approach to their SPAC IPOs. Specifically, GigCapital3 claimed to offer "financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company."

132.    GigCapital3 also asserted that it would "share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the [technology, media and telecommunications ("TMT")] . . . industry, to help shape corporate strategies" by appointing GigCapital3 management to the board of the identified public target entity.

133.    Moreover, according to GigCapital3's IPO prospectus filed on Form 424B4 with the SEC on March 26, 2021 (the "IPO Prospectus"): "We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the TMT industry. We stated that we will seek to identify such opportunities for value creation in evaluating potential business combinations."

### *Background of Legacy Lightning*

134.    Defendant Reeser founded Legacy Lightning in October 2008, then called "Lightning Hybrids," to design a vehicle intended for competition in the 2010 Automotive X Prize for a highly efficient sports sedan. In doing so, Legacy Lightning first attempted to outfit a traditional gasoline vehicle with a hydraulic hybrid regenerative braking system. However, Legacy Lightning eventually dumped this sports sedan idea allegedly because it was "too expensive to bring to market."

135.    For this reason, Legacy Lightning turned to commercial vehicles, as the company saw a "larger market" in that sector. Legacy Lightning first focused on designing a hydraulic hybrid system as a retrofit product for trucks and buses but encountered "slow" "market adoption."

136.    By 2017, Legacy Lightning shifted focus again, this time back to electric drive trains, citing the "rapidly growing market for EVs world-wide" where "opportunities are much greater."

137.    In December 2019, Legacy Lightning announced it raised $41 million in equity, debt, and working capital line funding from existing and new investors. This funding round was spearheaded by BP Ventures. At that time, Legacy Lightning maintained that it was "delivering powertrains for over $25 million in orders from major fleets, propelling Lightning Systems to the position of the established premium provider of a full range of platforms for commercial vehicle fleets."

***Legacy Lightning Needed Cash to Stay in Business and Experienced Significant Production Issues Prior to the Merger***

138.    However, Legacy Lightning was enduring hardships from widespread supply chain issues, problems locating parts, design revisions, hurried and haphazard installations, and shoddy and even dangerous final products that spawned customer dissatisfaction.

139.    Indeed, despite representing to shareholders and the market that Legacy Lightning had a "extensive ecosystem" of businesses supporting its supply chain and was therefore "optimized" for "quality, reliability, and cost," Legacy Lightning was far from it.

140.    For example, Legacy Lightning often did not have enough batteries because it had to work with smaller suppliers since the larger battery suppliers would not take Legacy Lightning's orders because Legacy Lightning did not have enough demand to place the large orders that large battery suppliers required. In result, Legacy Lightning would have to work with smaller suppliers

such as eMatrix Energy Systems ("eMatrix") that only could manufacture between four to seven batteries a week. Compounding this issue was the fact that many of the batteries Legacy Lightning did receive were faulty, sometimes causing Legacy Lightning vehicles to shut down or not perform at full capacity. Because of this, Legacy Lightning employees often had to perform maintenance on these vehicles by replacing the battery packs.

141.    Legacy Lightning's supply chain issues deteriorated further from 2020 into the beginning of 2021. Legacy Lightning struggled to find integral parts, which spurred Legacy Lightning to make a design change in the manufacture of its vehicles so that Legacy Lightning could produce more of them. By the beginning of 2021, Legacy Lightning would even ship vehicles to customers with poorly made parts with the intention of having Legacy Lightning employees "retrofit" the vehicles in the future once Legacy Lightning could obtain the correct parts.

142.    Similarly, in an effort to make it appear that Legacy Lightning was regularly producing vehicles, Legacy Lightning's management had employees complete customer orders based upon the parts available and the kind of parts each vehicle needed, rather than completing the customer orders in the order they were placed. For instance, since some of Legacy Lightning's vehicles only needed one battery while others required multiple batteries, Legacy Lightning employees were told to complete orders that required one battery first, so that output appeared steady and regular. However, this haphazard method caused some customers' vehicles to remain unfinished in Legacy Lightning's factory for weeks and sometimes even months on end.

143.    On top of suffering from a weak supply chain and low cash on hand, Legacy Lightning's vehicle quality was not as desirable as represented to the public either. A former technician at Legacy Lightning stated that the vehicles had a failure rate of around 40% to 50%,

even requiring repairs just mere days after leaving the factory. The Federal Securities Action interviewed six separate employees of Legacy Lightning, all of whom corroborated these circumstances. For instance, one of the confidential witnesses interviewed by plaintiffs in the Federal Securities Action, CW-1, who worked as a field service technician from early 2021 until mid-2021, stated that quality control at Legacy Lightning was "almost non-existent" and that employees who did repairs on vehicles often had to "wing it."

144.    Another confidential witness, CW-2, who worked as an engineer for Legacy Lightning from summer 2019 through summer 2020, and who was a liaison between the engineering team, sales team, and customers, stated that by May 2020, Legacy Lightning was laying off employees after product orders from Amazon and other companies did not "pan out."

145.    According to CW-2, Legacy Lightning furnished 15 vans to Amazon as part of a "pilot" program. But Amazon was so disappointed with the vans' range and overall performance that Amazon halted future orders. Moreover, CW-2 explained that the 15 Amazon vans were hurried through production because Legacy Lightning was "coasting on fumes" and required additional funding to operate properly. Amazon eventually ordered 100,000 delivery vans from a different electric vehicle manufacturer.

146.    Legacy Lightning's supply chain problems, cash problems, and vehicle quality problems were additionally affected by yet another problem: Legacy Lightning hired and laid-off employees pursuant to the ebb and flow of customer orders. In result, Legacy Lightning often did not have the necessary manpower or employees with experience to efficiently manufacture its vehicles. CW-2 stated that Legacy Lightning jobs required "skilled labor" and new employees required training. CW-2 also stated that Legacy Lightning's hiring practices were "not smart." Complicating the labor issue was Defendant Reeser's tendency to claim everything as a customer

order, even if the customer just made an "expression of interest." CW-2 summarized Legacy Lightning as "oversold" and "overcommitted."

147.    Another confidential witness,[9] CW-3, who worked as a technician repairing Legacy Lightning vehicles from late 2019 until spring 2020, corroborated CW-2's assessment of the situation, stating that a high ranking Amazon employee was angry about the amount of repairs that had to be made on the vans, even threatening to "pull the contract" and that Legacy Lightning had "screwed up" a $60 to $70 million contract by selling inadequate vans to Amazon. CW-3 stated that several Legacy Lightning employees often stated how "crappy" and "sketchy" Legacy Lightning's vehicles were since they were rushed to market and therefore "underdeveloped."

148.    CW-2 also detailed that Legacy Lightning's vehicles faced battery problems, which CW-2 thought was due to Legacy Lightning having to work with smaller, "lower tier" battery suppliers because the company did not enjoy enough business to make orders with larger battery suppliers. Another confidential witness, CW-4, who worked as a manufacturing supervisor at Legacy Lightning for a year until spring 2021, corroborated this account, stating that there was a "constant shortage" of parts, and that battery supplies were an issue since Legacy Lightning's suppliers were small and could only output small amounts of batteries. Because of this, Legacy Lightning often experienced weeks-long delays in battery orders, which significantly hampered vehicle production.

149.    CW-4 also stated that Legacy Lightning experienced a "lot of money issues" during that time, including struggling to pay suppliers. CW-4 maintained that when he first started at Legacy Lightning in 2020, there was no organized method of manufacturing vehicles. Instead,

_____

[9] All references to "CW" refer to the confidential witnesses interviewed in the Federal Securities Action.

CW-4, as a manufacturing supervisor, initially had to learn how to assemble the vehicles without written help. According to CW-4, near the end of 2020 and beginning of 2021, Legacy Lightning began to develop a standardized method of manufacturing, but still did not possess the capability to scale production. Because of this, according to CW-4, Legacy Lightning management subjected employees to stringent deadlines, long work weeks of up to 70 hours per week, and increased occurrences of workplace accidents. CW-4 also believed that Legacy Lightning used the funding it received from BP Ventures to buy equipment that made it appear that Legacy Lightning was "worth more" than it actually was and could do more functions in-house than it actually could.

150.    Similarly, CW-5 worked as a Legacy Lightning engineer from spring 2019 until spring 2020. CW-5 stated that certain vehicles left the factory with known issues because the "number one concern" at the company was getting customer orders. CW-5's experience corroborates CW-4's regarding lack of an organized manufacturing process, as CW-5 stated there was no "formal tracking tool" for employees who were manufacturing Legacy Lightning's vehicles. CW-6, who worked as a senior technician from mid-2019 to the fall of 2021 also corroborated CW-5's experience with the sending of vehicles with known issues to customers, stating that it was "relatively frequent" for vehicles to be sent to customers even though Legacy Lightning knew they would require service "upon arrival."

### *Commencement of Merger Discussions*

151.    By August 2020, Legacy Lightning brought in financial advisors to locate additional sources of capital. These advisors, including from Bank of America Securities, contacted GigCapital3 to discuss a possible business combination. These discussions unfolded over the following months.

152.    On September 24, 2020, the parties agreed to a letter of intent that proposed a post-merger enterprise value of approximately $1 billion, despite the fact that Legacy Lightning had never produced more than 100 vehicles in its history.

153.    In October 2020, Legacy Lightning renamed itself "Lightning eMotors" and began advertising its "current product range" as "among the best performing, best engineered and most reliable in the market."

**The Overpayment Misconduct**

154.    By October 2020, two of GigCapital3's IPO underwriters, Nomura, and Oppenheimer, were hired by GigCapital3 to serve as GigCapital3's financial advisors in merger discussions with Legacy Lightning. At no point did GigCapital3's board of directors ever ask Nomura or Oppenheimer to furnish a fairness opinion on the possible merger. Moreover, Defendants Katz and Dinu "dominated" GigCapital3's discussions with Legacy Lightning.

155.    Between September 2020 and November 2020, GigCapital3 and Legacy Lightning met with approximately forty-six different investors to raise additional capital for the potential merger through private investment in public equity ("PIPE") financing.

156.    Despite holding fifty-eight meetings with at least forty-six investors, the Individual Defendants, particularly Katz and Reeser, failed to receive any financial support for the possible merger since the proposed valuation of Legacy Lightning was so astronomically high.

157.    Facing this reality, in November 2020, GigCapital3 and Legacy Lightning chopped the valuation almost in half, shrinking it to $539 million from the original $1 billion mark. Nevertheless, they still sought at least $75 million in PIPE financing.

158.    However, GigCapital3 and Legacy Lightning still received almost no institutional investor takers. Of the forty-six investors contacted, only one indicated any interest. Therefore, 98% of institutional investors rejected the viability of the possible merger and the valuation.

159.    Further, GigCapital3 concluded that at the $539 million valuation, PIPE financing based on the "the sale and issuance of [c]ommon [s]tock," namely, the same common stock issued to GigCapital3's current shareholders, was not a "viable method for obtaining additional financing to support the combination."

160.    Therefore, Legacy Lightning and GigCapital3 manufactured a deal with Legacy Lightning's biggest investor, BP Ventures, to furnish $25 million in financing through the buying of 2.5 million GigCapital3 common shares. To cement the deal, GigCapital3 issued $100 million in convertible notes (the "Notes") to unnamed investors, which were convertible into 8,695,652 shares of GigCapital3 common stock at a conversion rate of $11.50 per share. Investors in the Notes also received, at no additional cost, 8,695,652 warrants with an exercise price of $11.50.

161.    The Notes paid out an annual interest rate of 7.5%, creating sizable debt for a company bringing in almost no revenue. The Notes were subject to a three-year term, and despite Lightning retaining the right to force conversion after a year, further interest payments would have to be paid.

162.    GigCapital3's and Legacy Lightning's deal to facilitate the proposed business combination between the two companies demonstrates that the super high valuation was patently unreasonable to institutional investors. Importantly, both the $25 million in PIPE financing from BP Ventures and the Notes transaction were entirely contingent on the closing of the Merger.

163.    On December 9, 2020, the GigCapital3 board of directors met and approved the Merger with Legacy Lightning without any prior indication of meeting to meaningfully discuss or

evaluate such a significant move. The very next day, on December 10, 2020, GigCapital3 and Legacy Lightning announced the Merger. The Merger agreement stated that Lightning shareholders would receive consideration in the form of GigCapital3 shares, in addition to a right to receive additional shares in an earnout. Upon closing of the Merger, it was determined that GigCapital3 would change its named to Lightning, and its common stock would trade on the NYSE under the ticker symbol "ZEV."

164.    Tellingly, the Defendants at GigCapital3 refused to obtain a fairness opinion from its financial advisors, any independent valuation, or any advice by independent counsel due to the probability that it would expose issues in the integrity of the valuation.

165.    Instead, the Individual Defendants and the Sponsor and the Director-Defendants (defined below) relentlessly pushed investors to approve a deal that was worth little to nothing, and far less than what investors would have received had GigCapital3 liquidated as planned.

166.    Indeed, in lieu of a neutral assessment of the company's valuation, Legacy Lightning provided GigCapital3 and its investors with inflated and factually baseless multi-year financial projections to justify the massive valuation and further mislead investors as they prepared to vote on the Merger.

167.    Upon information and belief, these projections, fabricated by Legacy Lightning in June 2020, were given to GigCapital3 on a spreadsheet after the letter of intent was signed in September 2020. The spreadsheet based Lightning's future growth on the projected delivery of thousands of products annually in future years despite the fact that Legacy Lightning had barely made $9 million in revenues in 2020 and had never made a profit, and was still suffering from production capacity, supply chain problems, and product installation issues.

168.    Defendants Reeser and Fenwick-Smith conveyed these financial projections to GigCapital3 and repeatedly represented these financial projections as fact in several public statements throughout the Relevant Period, despite the falsity of the statements. Indeed, the shareholders who later voted on the Merger relied on these statements since they were repeated throughout the Merger Proxy and in other public statements both before and after the Merger.

169.    Moreover, at the close of 2020, Legacy Lightning only delivered 97 vehicles since 2019, not including 12 demonstration vehicles. The company only had the capacity to produce 500 vehicles a year, and its production process was not an efficient, assembly line one, but rather an extremely customized, time-consuming process.

170.    Despite this dreary reality, Defendants painted Lightning as a "leading innovator" in the United States EV market. These representations could not have been further from the truth.

171.    Far from a "leading innovator," Legacy Lightning was plagued with technological and practical challenges that inhibited Defendants from knowing or representing anything concrete about the Company's commercial viability. This did not stop Defendants from concocting a false image of Legacy Lightning and its future prospects post-Merger which enabled funds locked in the Trust to be used in connection with funding the Merger and its associated costs.

172.    Basic due diligence would have revealed these issues and would have required a Company fiduciary to steer away from the value destroying asteroid GigCapital3 was headed towards. The Individual Defendants did the opposite, proceeding full speed ahead without any indication that GigCapital3's fiduciaries made any reasonable or basic investigation. Indeed, there is no indication that the GigCapital3 Board ever held any meetings to discuss the substantive pros and cons for GigCapital3 shareholders of pursuing the Merger or received any written materials related to its diligence in connection therewith.

173.    Despite this, the Merger closed on May 6, 2021. Immediately after the closing of the Merger, Lightning was owned primarily by GigAcquistions3 (8.3%), which Defendant Katz, along with Defendants Dinu, Miotto, Mikulsky, Wang, and Betti-Berutto owned, Defendant Fenwick-Smith (6.8%), Defendant Reeser (1.9%), and Aravaipa Venture Fund (6.3%), which Defendants Fenwick-Smith and Reeser have interests in.

174.    Proceeding with the Merger proved costly in numerous ways, including by exposing GigCapital3, the Sponsor, and the other Defendants to several costly lawsuits against the Company, among other things. Just months after the closing of the Merger, the Company's shareholders automatically lost 16.93% of the $10 per share they put into the Trust without considering the value destruction caused by Lightning's supply chain issues, production issues, and false and misleading statements. Given their conflicts of interest, the Company's Board failed to adequately inform shareholders about their prospects post-Merger, including that redeeming their shares would be a better idea.

**False and Misleading Statements**

***May 13, 2020 GigCapital3 Registration Statement***

175.    On May 12, 2020, GigCapital3 filed its registration statement with the SEC on Form S-1 (the "GigCapital3 Registration Statement"). On May 13, 2020, the GigCapital3 Registration Statement was declared effective by the SEC. GigCapital3 Registration Statement alluded to several unique capabilities of GigCapital3, especially regarding GigCapital3's "Mentor-Investor" approach:

> Our management team has significant hands-on experience helping TMT companies optimize their existing and new growth initiatives by exploiting insights from rich data assets that already exist within most TMT companies. We intend to apply a unique "Mentor-Investor" philosophy to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company.

Further, we intend to share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the TMT industry, to help shape corporate strategies. Additionally, our management team has operated and invested in leading global TMT companies across their corporate life cycles and has developed deep relationships with key large multi-national organizations and investors. We believe that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination.

\* \* \*

Consistent with our strategy, we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses and, when evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us. We are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion.

\* \* \*

We will prioritize entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to succeed with support from an interactive and hands-on board of directors.

***December 10, 2020 Press Release***

176.    On December 10, 2020, Lightning issued a press release that announced the Merger and described Lightning as a "leading innovator" in the U.S. commercial EV sector and as a "high-growth electric vehicle manufacturer."

177.    The press release stated that Lightning was enjoying considerable growth, had a production capacity of 1,000 vehicles annually, and would attain annual production capacity of 20,000 medium duty commercial vehicles by 2025. The press release also told investors that Lightning possessed "strong visibility" into future revenue because "100% of [Lightning's] projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million is under

firm purchase orders as of today, and strong line of sight to $2 billion in projected 2025 revenue, including $1 billion from existing fleet customers."

178.    Defendant Reeser stated in the press release that the "capital raised in this transaction will enable Lightning eMotors to accelerate its growth plans and fulfill significant demand from our customers."

### December 10, 2020 Investor Conference

179.    Later that same day, on December 10, 2020, the Defendants held a conference call with investors. During the call, Defendant Dinu stated that "[a]s part of GigCapital3's Private-to-Public Equity (PPE)™ strategy, we look for opportunities where we can quickly bring Companies to the public market in order to accelerate their growth and partner with them for the long-term." Defendant Dinu definitely stated "Lightning eMotors is the only company that met our target objectives."

180.    Defendant Dinu went on to state that "[t]he company has superior technology, the largest manufacturing facility for electric commercial vehicles in the US, excellent leadership, and critically from a market perspective, the best revenue visibility." Defendant Dinu also stated that "Lightning enjoys dominant market positioning with a robust backlog of contracts, which will enable the company to quickly scale revenues." Defendant Dinu also stated that the money influx from the Merger would allow Legacy Lightning to "be fully financed to expand capacity from 1,000 vehicles per year currently to 10,000 vehicles per year in 2022."

181.    Also, during the call, Defendant Reeser stated that "[t]hose orders and those customers that we've already earned provide a great deal of insight into our projected revenue of $2 billion for 2025, and provide strong visibility over the next five years and to where that revenue comes from and what it is, with contracted orders that we already have in place today":

58



182.    The conference with investors also stated that Lightning's revenue was "100%" covered through 2021 with "visibility to $1b revenue based on current contract pipeline":



*January 4, 2021 Slides*

183.    On January 4, 2021, GigCapital3 filed a slide deck with the SEC which described the Merger pursuant to Rule 425 of the Securities Act. The presentation included a slide that depicted Legacy Lightning's "Key Investment Highlights" which stated Legacy Lightning has "Robust Contracts with Financial Visibility" and had "100% of 2021 revenue forecast contracted as of Q3 2020."

184.    The slides also stated that Legacy Lightning works with several suppliers and by doing so "has prevented major disruptions in production" and "has added and built additional redundancies into the supply chain . . . to mitigate supply-chain risk."

185.    The slides also represented that Amazon was one of Legacy Lightning's "Select Key Customers":



***January 12, 2021 Winter ICR Conference Presentation***

186.    On January 12, 2021, GigCapital3 filed a slide deck with the SEC which described the Merger pursuant to Rule 425 of the Securities Act. The slides referenced GigCapital3's "Mentor-Investor" approach, stating that GigCapital3 will be "Participating actively at the company's BOD and SAB [Strategic Advisory Board]" and "Provid[ing] continuous Financing and M&A advisory for growth and consolidation" for two to five years after the Merger closes.

The slides also stated that "Per GigCapital Mentor-Investor™ charter," "GigCapital members to join Lightning eMotors BOD and SAB" "To provide continued support and guidance on audit, governance, financing, M&A."

### Series of Announcements Heralding Partnerships Ahead of Shareholder Vote

187.    Between December 2020 and March 2021, in the months preceding the shareholder vote to approve the Merger, Defendants tried to characterize Legacy Lightning as a successful company through the announcements of new partnerships while still lauding baseless revenue growth projections.

188.    On January 5, 2021, Legacy Lightning announced that "ABC Companies, a premier provider to the transportation industry, place[d] $45M order for 200 additional electric vehicles."

189.    Similarly, on March 20, 2021, Legacy Lightning announced that "Fluid Truck Orders 40 Additional Zero Emission Trucks." And on March 24, 2021, Legacy Lightning heralded a similar message, stating "DHL Express Deploys Nearly 100 New Lightning Electric Delivery Vans in U.S."

### Merger Proxy

190.    On March 22, 2021, GigCapital3 filed the Merger Proxy with the SEC, which served as a proxy statement, consent solicitation statement, and prospectus. The Individual Defendants solicited the Merger Proxy filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions and failed to correct prior misstatements.

191.    The Merger Proxy informed GigCapital3 shareholders that a special meeting would commence on April 21, 2021, for the purpose of voting on the Merger and related transactions, including the PIPE and Notes financings, and told shareholders that the deadline for exercising their redemption rights was April 19, 2021, just two business days before the special meeting.

192.    The Merger Proxy called GigCapital3 shareholders to, *inter alia*: (1) approve the Merger; (2) approve the PIPE and Notes financing; (3) approve the classification of the Board; (4) approve the Incentive Plan; and (5) approve the elections of Defendants Fenwick-Smith, Katz, Reeser, Dinu, Senko, Miotto, Coventry, and Tremblay to the Board.

193.    The Merger Proxy included the same financial projections disseminated in December 2020 to investors, compiled by Lightning management, that depicted significant growth over the coming five years. Specifically, the projections maintained that from 2020 to 2025, Lightning's revenues would rise from $9 million to more than $2 billion, and Lightning's annual gross profits would increase from zero to more than $500 million. The projections appeared as follows:

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Revenue | $9 | $63 | $354 | $640 | $1,165 | $2,012 |
| *Gross Growth* | *NM* | *NM* | *462%* | *81%* | *82%* | *73%* |
| Gross Profit | $0 | $9 | $68 | $140 | $296 | $528 |
| *Gross Margin* | *3%* | *14%* | *19%* | *22%* | *25%* | *26%* |
| EBITDA | ($11) | ($17) | $15 | $50 | $155 | $315 |
| *EBITDA Margin* | *(122%)* | *(27%)* | *4%* | *8%* | *13%* | *16%* |

$ values are in millions.

194.    The Merger Proxy further stated that Legacy Lightning would "expand [] its production facility by roughly 107,000 square feet to prepare for capacity expansion to 3,000 vehicles per shift per year" from its current capacity of 500 vehicles per shift per year:

> We currently operate a single labor shift with a capacity to manufacture and assemble 500 ZEV vehicles and/or powertrain units per year in a facility with approximately 70,000 square feet of manufacturing space. In November of 2020, Lightning Systems built out 20,000 square feet in our current building and executed a lease for an additional 107,000 square feet of manufacturing space in the adjacent building. The campus has a total of nearly 1 million square feet, of which over 500,000 is still available. Lightning Systems also has a first right of refusal to lease the remaining 500,000 square feet in the campus over the next 4 years. With the additional space added this year, along with additional labor, automation, and larger

batch manufacturing, we have capacity to manufacture and assemble 3,000 ZEV vehicles and/or powertrain units per year, on a single labor shift.

195.    The Merger Proxy told shareholders that Legacy Lightning built "a complete modular software and hardware solution" that "broaden[ed] and strengthen[ed]" its access to a $67 billion market.

196.    The Merger Proxy also repeated Legacy Lightning's assertion that the company had "already received purchase orders to completely cover its estimated 2021 and over 25% of 2022 revenue."

197.    The statements and representations referenced in ¶¶ 193-196 were materially false and misleading because such projections failed to account for true commercial viability of the Company's products, or the fact that Legacy Lightning had yet to develop the manufacturing technology necessary to support its production forecasts. In fact, Legacy Lightning had only produced a handful of vehicles in 2020 and had no ability to scale its production in time to make revenues of $2 billion. The Merger Proxy boasted about the Company's anticipated "capacity expansion to 3,000 vehicles per shift per year," but the Company had no assembly line or standardized process of manufacturing vehicles. Moreover, the Merger Proxy claimed that the Company had "already received purchase orders to completely cover its estimated 2021 and over 25% of 2022 revenue," a representation patently false as even the Company's exaggerated projections relied upon imaginary customers. Additionally, the Merger Proxy failed to include risks presented by the Company's technological and supply chain impediments with actually performing on any such contracts. Given that the Company would not recognize any revenue until actually providing anticipated vehicles to real customers, the projections set forth in the Merger Proxy for 2022, 2023, 2024, and 2025 were false, and projected gross profits beyond 2022 were materially misleading due to the lack of any functional technology, vehicles, or sufficient customer

orders to meet the astronomical revenues alleged. These projections were not based on any reasonable assumptions.

198.    The Merger Proxy stated that GigCapital3 would have a "Mentor-Investor" relationship with Legacy Lightning for three to five years after the closing of the Merger, in relevant part:

> In the prospectus for our IPO, we identified the following general criteria and guidelines that we believed would be important in evaluating prospective target businesses, although we indicated we may enter into a business combination with a target business that does not meet these criteria and guidelines. Generally, we stated that we are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion. The Company's Board considered each of the factors identified in the IPO prospectus in its evaluation of Lightning Systems. Furthermore, in light of the due diligence conducted of Lightning Systems and the evaluation of the following factors with regard to Lightning Systems, the Company's Board's decision to pursue a Business Combination with Lightning Systems resulted in the Company's Board deciding not to forego this Business Combination and instead continue to look for an alternative acquisition target.
>
> * * *
>
> We believe that through our Mentor-Investment approach, we will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation. In particular, Lightning System's intent stated to us in diligence to pursue acquisitions as a means to accelerate its growth plans or augment its internal product and service development if such acquisitions represent a strategic fit, drive value and are consistent with its overall strategy is well suited to the assistance that we can provide, and makes Lightning Systems a very suitable target for our business combination.
>
> * * *
>
> Notwithstanding the significant progress that Lightning Systems has made in developing itself as a market leader, with $169 million of backlog as of December 31, 2020, and a pipeline of $800 million of sales as of December 31, 2020, it is still a relatively small company, with 93 employees and 43 contractors as of December 31, 2020, with substantial growth opportunity in front of it that we believe can benefit from our Mentor-Investment approach.

199.    The statements and representations referenced in ¶ 198 were materially false and misleading because GigCapital3 management, including Defendants Katz, Dinu, Mikulsky, Miotto, Wang, and Betti-Berutto were not planning to and did not have the intention to work with

Lightning over a "3 to 5 year horizon." Instead, they planned to cash in on completing the Merger and abandon Lightning as soon as possible. Indeed, this can be seen just days after the Merger was completed on May 11, 2021, when Defendants Katz and Dinu had the new Lightning Board vote to reclassify the Board so that they could leave the Board in October 2021 instead of having to serve the three- and two-year terms they each were elected to just days prior. The plan concluded on October 7, 2021, when Defendants Katz, Dinu, and Miotto all declined to sit for re-election to the Board.

200.    The Merger Proxy also addressed shareholder dilution due to the PIPE and Notes financings, stating that "The issuance of the Common Stock in the Business Combination and in the PIPE Investment, as well as the conversion of the Convertible Notes, will dilute the equity interest of our existing stockholders and may adversely affect prevailing market prices for our public shares and/or public warrants."

201.    The Merger Proxy further addressed the relationship between public warrants issued in GigCapital3's IPO and the chance of shareholder dilution, explaining that the issuance of shares in connection to the exercise of a warrant will result in dilution because it will "increase the number of shares eligible for resale in the public market," and that "[s]ales of such shares in the public market could adversely affect the market price of our Common Stock."

202.    The statements and representations referenced in ¶¶ 200-201 were materially false and misleading because they do not accurately inform investors of the reality of the situation facing both GigCapital3 and Legacy Lightning before the Merger, and they do not adequately inform investors of the true value of their shares at the time of their voting on the Merger due to the outsized number of warrants outstanding at the time of the Merger. Since warrants give warrant holders the option to purchase company shares at a price lower than the market price, the value of

65

outstanding shares is reduced. Specifically, the issuance of the PIPE and Notes financings, which included warrants, reduced the cash-per-share value of the shareholders' shares, not just the shareholders' percentage of shares outstanding. The Merger Proxy failed to inform the shareholders of this vital fact as they prepared to vote on the Merger. As far as the dilution caused by the exercise of warrants is concerned, the Merger Proxy failed to disclose the reduction of value in the Company's outstanding shares due to warrant holders being able to buy shares below the market price. As a result, outstanding GigCapital3 warrants should have been viewed as a liability.

203.    The Merger Proxy also dissuaded investors from voting against the Merger by improperly suggesting that there would be not enough funds for shareholders to recoup their cash should they choose to redeem their shares instead of voting for the Merger:

> If we fail to complete an initial business combination by the applicable deadline, then we will: (i) cease all operations except for the purpose of winding up; (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem our public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest not previously released to the Company to pay its franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish our public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In the event of such distribution, it is possible that the per share value of the residual assets remaining available for distribution (including Trust Account assets) will be less than the initial public offering price per unit in the IPO.

204.    Later in the Merger Proxy, the Merger Proxy again suggests that redeeming shareholders may not receive their agreed-upon $10.00 per share plus interest, stating that "[t]he Sponsor may not have sufficient funds to satisfy its indemnity obligations," because "[Gig3] has not asked the Sponsor to reserve for such indemnification obligations."

205.    The statements and representations referenced in ¶¶ 203-204 were materially false and misleading because the IPO proceeds were specifically held in Trust for this very reason (i.e., the possibility of redemption or liquidation). Additionally, the Merger Proxy misleadingly suggested that a redeeming shareholder may not receive their $10.00 plus interest due to the company's inability to pay off third-party creditors. These statements were false and misleading because SPACs, and specifically the Sponsor, regularly agree to indemnify shareholders against third-party claims, as the Sponsor did in this instance.

206.    The Individual Defendants caused the Merger Proxy to be materially false and misleading because it failed to disclose, *inter alia*: (1) the PIPE and Notes financing significantly reduced the value of shareholders' shares due to the large number of warrants outstanding; (2) the Defendants were not planning on staying with the Company for the represented three to five year window; (3) Legacy Lightning did not have a supply chain strong enough to support ramped up production; (4) Legacy Lightning's supply chain and "vehicle performance" was not as reliable and not of the quality as Defendants represented;  (5) Legacy Lightning did not have the capacity to produce 500 vehicles a year; (6) in light of the foregoing, Legacy Lightning's financial projections were impossible to attain and patently unrealistic; and (7) Defendants were improperly interested in increasing their unjust compensation and their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

207.    The Merger Proxy explicitly maintained that the GigCapital3 board unanimously supported the Merger after having "analyz[ed]" the proposed Merger and found that the transactions solicited in the Merger Proxy were "in the best interest of our stockholders." The

GigCapital3 board unabashedly recommended that shareholders approve the transactions contemplated in the Merger Proxy.

208.    The Merger Proxy also disclosed the unanimous support and recommendation of the Board of Legacy Lightning, which included Defendants Reeser and Fenwick-Smith, who also solicited shareholder approval for the Merger and related proposals in the Merger Proxy.

209.    As a result of the material misstatements and omissions contained in the Merger Proxy, Company shareholders voted to: (1) approve the Merger; (2) approve the PIPE and Notes financing; (3) approve the classification of the Board; (4) approve the Incentive Plan, materially benefitting Defendants Fenwick-Smith, Katz, Reeser, Dinu, Senko, Miotto, Coventry, and Tremblay (among others); and (3) elect Defendants Fenwick-Smith, Katz, Reeser, Dinu, Senko, Miotto, Coventry, and Tremblay to the Board.

210.    Given the lack of appropriate and accurate disclosures in the Merger Proxy Statement, GigCapital3 shareholders were unable to evaluate what they would receive in connection with any investment in the post-Merger Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company with little to no value.

### *March 26, 2021 Press Release*

211.    On March 26, 2021, the Defendants issued a press release that boasted that Legacy Lightning had "[h]igh revenue visibility with 100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today, and strong line of sight to $2 billion in projected 2025 revenue, including $1 billion from existing fleet customers."

212.    In the press release, Defendant Dinu stated that "The GigCapital team stays true to our Mentor Investor mission partnering with the exceptional management team of Lightning eMotors through the IPO and beyond, as we continue to build together a solid company to last."

213.    Also in the press release, Defendant Reeser stated that "Lightning eMotors has maintained remarkable momentum since we announced the proposed business combination in December."

214.    The press release also emphasized Legacy Lightning's "extensive ecosystem" of supply chain partners that was "optimized" for "quality, reliability, and cost."

***March 31, 2021 Form 10-K***

215.    On March 31, 2021, GigCapital3 filed its annual report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Katz, Weightman, Miotto, Mikulsky, Dinu, Betti-Berutto, and Wang. Attached to the 2020 10-K were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Katz and Weightman attesting to the accuracy of the 2020 10-K.

216.    The 2020 10-K stated the following about GigCapital3's commitment to the "Mentor-Investor" approach, in relevant part:

> Our management team has significant hands-on experience helping Technology, Media and Telecommunications ("TMT") companies optimize their existing and new growth initiatives by exploiting insights from rich data assets that already exist within most TMT companies. We intend to apply a unique "MentorInvestor" philosophy to partner with Lightning where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company. Further, we intend to share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the TMT industry to help shape corporate strategies. Additionally, our management team has operated and invested in leading global TMT companies across their corporate life cycles, and has developed deep relationships with key large multi-national organizations and

investors. We believe that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination. We believe that we are providing an interesting alternative investment opportunity that capitalizes on key trends impacting the capital markets for TMT companies.

### May 6, 2021 Press Release

217.    On May 6, 2021, after the market closed, Lightning issued a press release titled "Lightning eMotors and GigCapital3 Announce Closing of Business Combination." The press release stated, in relevant part:

> Lightning eMotors has been providing specialized and sustainable fleet solutions since 2009, deploying complete zero-emission-vehicle (ZEV) solutions for commercial fleets since 2018 – including Class 3 cargo and passenger vans, Class 4 and 5 cargo vans and shuttle buses, Class 6 work trucks, school buses, Class 7 city buses, and Class A motor coaches. The Lightning eMotors team designs, engineers, customizes and manufactures zero-emission vehicles to support the wide array of fleet customer needs including school buses and ambulances, with a full suite of telematics, analytics and charging solutions to simplify the buying and ownership experience and maximize uptime and energy efficiency.

218.    The statements and representations referenced in ¶¶ 211-217 were materially false and misleading because such revenue projections failed to account for the true commercial viability of the Company's products, or the fact that Legacy Lightning had yet to develop the manufacturing technology necessary to support its production forecasts. In fact, Legacy Lightning had only produced a handful of vehicles in 2020 and had no ability to scale its production in time to make revenues of $2 billion. The May 6, 2021 press release boasted that the Company "has been providing specialized and sustainable fleet solutions since 2009," but the Company had no assembly line or standardized process of manufacturing vehicles. Moreover, the 2020 10-K claimed that GigCapital3 would use its "Mentor-Investor" approach after the Merger for years to come, which was a patently false representation as Defendants Katz, Dinu, and Miotto abandoned their director roles just months after the Merger closed. Additionally, these representations failed

70

to include risks presented by the Company's technological and supply chain impediments that prevented actual performance on any such contracts. Given that the Company would not recognize any revenue until providing anticipated vehicles to real customers, the projections set forth for 2022, 2023, 2024, and 2025 were false, and projected gross profits beyond 2022 were materially misleading due to the lack of any functional technology, vehicles, or sufficient customer orders to meet the astronomical revenues alleged. These projections were not based on any reasonable assumptions.

### The New Lightning Board Reclassifies the Board Immediately After the Merger as the Investing Public Remains in the Dark About Lightning's Business and Prospects

219.    Just five days after the Merger closed, on May 11, 2021, the newly minted Lightning Board met, deciding to reclassify the directorships of Defendant Katz, who was then the Co-Chairman of the Board, and Defendant Dinu, so that like Defendant Miotto, both Katz and Dinu would only have to serve a one-year term on the Board. Instead of having to serve three-year and two-year terms, Defendants Katz and Dinu would now be able to stand for re-election just mere months later, on October 7, 2021, at the Company's first annual shareholder meeting.

220.    With this sudden and swift action, Defendants signaled their abandonment of their pledge to Lightning's shareholders that they would employ a "Mentor-Investor" model as part of a three-to-five-year commitment to guide and grow the Company for years to come. Lightning's price per share subsequently dropped $16.80 per share, from $148.80 per share on May 11, 2021, to close at $132.00 per share on May 12, 2021.

#### *May 17, 2021 Press Release*

221.    On May 17, 2021, just eleven days after the Merger closed, Lightning issued a press release titled, "Lightning eMotors Reports $4.6 million of Revenue in First Quarter of 2021 From Sales of 31 Commercial Electric Vehicles and Provides 2021 Outlook," detailing the Q1 2021

71

revenues. The press release announced revenues of $4.6 million and stated that "Based on current business conditions, business trends and other factors, for the full year 2021 ending Dec. 31, 2021, the Company expects . . . Revenues to be in the range of $50 million to $60 million":

• Despite supply chain headwinds, Lightning Systems reported Q1 sales of 31 purpose-built, commercial zero emission vehicles.

• First quarter 2021 revenue of $4.6 million, up from the first quarter 2020 revenue of $0.7 million. This is in line with the quarterly growth required to meet the 2021 revenue guidance below. The Company incurred a loss from operations of $5.3 million during the quarter.

• Vehicle sales for the quarter included electric shuttles buses, delivery vehicles, refrigerated trucks, ambulances and RVs across Classes 3, 4 and 5, shipped to customers including DHL Express, Fluid Truck, ABC Companies, Meals on Wheels and others, all with 1 Hz telematics providing big-data information on commercial electric vehicles' range, payload, efficiency and reliability.

• Backlog at quarter end of $169 million and sales pipeline of $807 million respectively.

Tim Reeser, chief executive officer of Lightning eMotors said, "We are delivering purpose-built commercial zero-emission vehicles today from a factory that is already in production, continuing to add to our two years of customer on-the-road experience, validation and data. Q1 2021 continued the fast sales and delivery growth that started in 2020. As our production capacity, supply chain diversification, automation implementation, and marketing efforts increased, so did our abilities to execute deliveries at a record pace. As a result, Lightning eMotors is well-positioned to achieve its 2021 forecast of over 500 purpose-built zeroemission commercial vehicles. Our results, and the head start that our data, production experience and customer validation provide us, demonstrates the value of real purchase orders and real deliveries."

Reeser further noted, "We have spent the last 12 years developing our proprietary modular hardware and software platforms. We have partnered with fleets all over the U.S. to build best-in-class, purpose-built, zero-emission battery-electric and fuel-cell-electric commercial solutions to meet the high-level of customization required by fleets. In the past year, we have added nearly 100 employees with a large focus on our engineering and manufacturing teams, and in the short period since announcing our merger with GigCapital3, Lightning eMotors has bolstered our executive team with a distinguished chief financial officer, chief procurement officer, and chief revenue officer and announced several commercial partnerships and new large fleet customers. The capital raised in the merger transaction will enable Lightning eMotors to accelerate its growth plans and fulfill significant

demand from our customers, including some of the most recognizable transportation, public safety and e-commerce companies in the U.S. We are excited to begin our next chapter as a public company."

\*\*\*

Full Year 2021 Revenue, Gross Margin, Operating Loss and Vehicle Sales Outlook

Based on current business conditions, business trends and other factors, for the full year 2021 ending Dec. 31, 2021, the Company expects:

• Revenues to be in the range of $50 million to $60 million.

• Vehicle and powertrain sales of 500 units.

• Extreme supply chain shortages will have a significant impact on short-term margin and operating costs, resulting in a small, negative gross margin for the full year. However, margins are expected to progressively improve over the next three quarters from the -16% in Q1 as the Company ramps production and benefits from operating leverage. Operating losses will also be impacted and are expected to be higher each quarter than the first quarter loss of $5.3 million with public company costs as well as higher investments in research and development and sales, general and administrative costs to scale the business.

### *May 17, 2021 10-Q*

222.    Also on May 17, 2021, the Company filed its quarterly report with the SEC for the

period ended March 31, 2021, on a Form 10-Q (the "1Q21 10-Q"). The 1Q21 10-Q was signed by

Defendants Reeser and Covington and contained SOX certifications signed by Defendants Reeser

and Covington attesting to the accuracy of the financial statements contained therein, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any

fraud committed by the Company, its officers, or its directors.

223.    The 1Q21 10-Q stated, in relevant part:

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. ***Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed***

73

***or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.***

Evaluation of Disclosure Controls and Procedures

As required by Rules 13a-15 and 15d-15 under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2021. ***Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were effective.***

(Emphasis added.)

### *May 24, 2021 Press Release*

224.    On May 24, 2021, Lightning issued a press release titled, "Lightning eMotors' CEO and Leadership Team Ring Opening Bell at New York Stock Exchange." The press release stated, in relevant part:

"Trading on the exchange and ringing the bell on Wall Street are big milestones for our company," said Tim Reeser, CEO of Lightning eMotors. "However, we remain focused on the task at hand. In the past six months, we've added 22 new fleet customers, giving us an overall total of 46 fleet customers. We have vehicles on the road in 17 different market segments, including corporate and educational campus transit, micro and mass transit, middle-mile and last-mile delivery, airport shuttles, food trucks, postal delivery, and electrical services. Many of our customers also are placing repeat orders after successful initial deployments.

\*\*\*

Last week, Lightning eMotors reported first quarter revenue of $4.6 million, having delivered vehicles across five specialty vehicle applications despite global supply chain challenges.

### *May 27, 2021 Resignation of Lightning's Chief Procurement Officer*

225.    On May 27, 2021, approximately two months after joining the Company, Lightning's Chief Procurement Officer, Stephen Ivsan, abruptly resigned from his position.

Ivsan's role as Chief Procurement Officer was used by the Defendants in the Merger Proxy, and his role was integral to the Company, as Ivsan's job oversaw Lightning's supply chain.

### June 17, 2021 Analyst and Investor Day

226.    On June 17, 2021, Lightning held an Analyst and Investor Day during which the Company invited analysts to the Company's factory for a presentation. During the presentation, the Individual Defendants again told investors about revenue and projection guidance. During the presentation, Defendant Reeser stated that "we do feel confident in [Lightning's financial projections]."

227.    The conference began with a video narrated by Defendant Reeser. During the video, Defendant Reeser touches on Lightning's ability to scale production and meet customers' customized needs:

> You'll see in our factory a lot of customized vehicles, like shuttle buses with wheelchair lifts, like large Class 6 trucks with refrigerators, or with custom lifts on the back. Our ability to deliver a very wide variety of technologies, order sizes, configurations, and customizations in a very cost-effective manner to our customers makes us highly unique and specialized in this space.

> * * *

> What you won't see in our factory is commodity, one-size-fits-all, pickup trucks, small vans, or tractor-trailers.

228.    During another part of the presentation, Defendant Reeser stated that "[w]e build the electric vehicles nobody else is building. We also build the electric vehicles nobody else wants to build."

229.    Lightning management also represented that the Company had a "established network of US commercial vehicle manufacturing partners – making it easier to scale!" During this time, Lightning stated that despite issues with chassis and battery supplies, the Company was

standing behind its 2021 Fiscal Year guidance of $50 to $60 million, while also projecting a positive gross margin for the fourth quarter of 2021:



230.    Specifically, Lightning's Chief Technology Officer Jim Kelley stated that, regarding the supply chain, "[t]he other serendipitous value is, because we have numerous supplies that can be applied to the same platforms. When one supplier has a particular issue or a struggle, we're able to use multiple battery configurations on a particular chassis" and "that flexibility allows us . . . some diversification of our supply chain, when times get rough for some of these guys." Defendant Covington concurred in Jim Kelley's assessment of battery supply situation, stating that "as Bill talked about on his slide, we have multiple partners across many of the parts that we purchased, which is one of the ways that we have been one managing the cost, as well as managing some of the supply chain disruptions that we've had," and that the supply chain would produce positive gross margin in the fourth quarter of 2021. Defendant Covington reiterated that Lightning was "planning to grow our capacity, estimating from 500 units [in 2021] to 3,000 units next year."

***July 8, 2021 Prospectus***

76

231.    On July 8, 2021, Lightning filed a prospectus on Form 424B3 with the SEC (the

"July 8, 2021 Prospectus"). The July 8, 2021 Prospectus stated, in relevant part:

> We believe we are the only full-range manufacturer of Class 3 to 7 BEV and FCEV
> in the United States and provide end-to-end electrification solutions including
> advanced analytics software, charging solutions (which we refer to as "Energy-as-
> a-Service") and financing (which we refer to as "EV-as-a-Service"). We combine
> optimized modular software with a customized hardware design that allows us to
> address the diversified opportunities in the markets in which we operate in a cost-
> effective manner with a significant time-to-market advantage. We have also built
> an extensive ecosystem of supply-chain partners and specialty vehicle partners
> which are instrumental to our growth.
>
> ***
>
> We optimize our supply chain for quality, reliability, and cost. We believe our long-
> term relationships with supply chain partners will be a key driver in our ability to
> scale without unduly sacrificing quality or delivery times and serve as a foundation
> for our growth. Because we have relationships with multiple suppliers for each core
> component of our vehicles, we are able to build and maintain a high degree of
> resilience in our supply chain, which will assist us with mitigating delays. We also
> partner with battery pack manufacturers allowing us to keep the latest battery
> technology in our vehicles at the time of manufacturing. To this end, we have
> recently entered into a three-year contract with our primary battery supplier, Romeo
> Power Technology, that will secure battery inventory without significant
> fluctuations in cost. We believe, that through careful supply chain management and
> the cultivation of long-term relationships with our suppliers, we can reduce our
> cost-of-goods-sold by up to 50% over the next 18 months. Continuous
> communication and partnerships with all of our suppliers has enabled us to maintain
> cutting-edge technology in our vehicles at the lowest possible cost.

232.    The July 8, 2021 Prospectus stated the following regarding market opportunity, in

relevant part:

> Our large and growing Total Addressable Market ("TAM") is comprised of Class
> 3 to 7 medium-duty commercial vehicles, including shuttle buses, ambulances,
> delivery vans & trucks, bucket trucks, food trucks and coaches, among others.
> Regulatory tailwinds and a rapidly improving cost structure have accelerated the
> pace of adoption for electric vehicles, allowing operators to transition fleets to zero-
> emission standards in accelerated timelines. Our modular software and hardware
> solution enables us to serve a variety of attractive niche markets in a cost-effective
> and efficient manner. While other manufacturers and OEMs have focused on one
> or two classes of vehicles, we are currently the only company in the United States
> that is focused on delivering reliable, zero-emission vehicles—in both battery
> electric and fuel-cell electric designs—across Classes 3 to 7. By leveraging, and in

some cases modifying, existing components, we have built a complete modular software and hardware solution that can be installed in medium-duty vehicles across classes and types, thus broadening and strengthening our TAM.

We estimate our TAM across Class 3 to 7 vehicles is roughly $67 billion annually worldwide based on 2018 data from the U.S. Department of Energy. The US market is approximately $22 billion, while the global offshore market is approximately $45 billion, resulting in a total addressable market of approximately $67 billion. In the United States, we estimate that a total of 539,000 vehicles are sold annually in the U.S. across these 5 classes, with Class 3 accounting for the greatest portion of the total, at 301,000 vehicles. Globally, we estimate that an additional 993,000 vehicles across these classes are sold annually.

233.    The July 8, 2021 Prospectus stated the following regarding Lightning's "competitive advantages," in relevant part:

We believe the following strengths will allow us to maintain and extend our leadership position.

***

• First-mover advantage in the rapidly growing commercial ZEV space. We believe that we are ahead of our peers in customer validation with $169 million of backlog as of December 31, 2020 and a 36% market share across Class 3 to 6 ZEVs in 2020. Our two-year head start in the commercial ZEV space led to significant progress in customer validation. Commercial fleet customers require high reliability and a full-service network. In addition, they must factor TCO to validate the economic viability of the solution. The total sales cycle therefore typically ranges from 3 to 24 months and requires significant time and effort as well as deep engagement with customers throughout the process. Benefiting from our head start in the market, we already have 121 vehicles on the road as of February 22, 2021 (including 12 demonstration and test vehicles) and 30 fleets who have placed purchase orders, 10 of which have placed repeat orders. Through years of effort and cumulative customer validation, we have now reached the tipping point of an accelerated sales cycles which is expected to fuel our next phase of growth.

***

• **Established strategic partnerships to optimize procurement and go-to-market strategy**. Since 2008, we have built an extensive ecosystem of supply-chain partners and specialty vehicle partners. Our suppliers are instrumental to the performance and reliability of our vehicles and enable us to scale in a relatively asset light and cost-effective manner. Our key suppliers include Ford, BorgWarner, Romeo Power, Hino and Delta Electronics, among others, all of which are industry leading manufacturers of critical components like chassis, bodies, batteries and chargers. Plug Power, a leading hydrogen solution manufacturer, is one of our key

supply chain partners with which we have established a multidimensional strategic partnership. We work with Plug Power to manufacture fuel cell-powered vehicles. We also leverage their extensive hydrogen fueling infrastructure and collaborate in the go-to-market strategy to sell class 3 through class 7 FCEVs. Our specialty vehicle partners are also critical to our rapid growth strategy and enable us to apply our modular technology to an expanding range of markets including recreational vehicles, ambulances, coaches etc. We work closely with OEMs including Winnebago, Rev Group and ABC Companies to electrify vehicles in their target markets that they manufacture. For example, we are the exclusive motor-coach RePower electrification solution provider to the leading motor-coach company, ABC Companies. Our electric RePower solution (replacing ICE with EV in older buses) has a 18-month shorter delivery time and is economically competitive (approximately half the price) compared to many new electric buses and coaches manufactured by other OEMs. Given our demonstrated capabilities, we received a $48 million purchase order from ABC Companies in September 2020.

234.    Lastly, the July 8, 2021 Prospectus stated the following regarding growth strategy,

in relevant part:

• **Acquire new customers**. By leveraging our strategic partners including Plug Power and ABC Companies, we will continue to win new customers and expand into new markets. In addition, despite a relatively small sales staff, we have been able to generate strong revenue growth and a large pipeline of customers. We also intend to bolster our sales staff as we grow to help improve our pipeline and acquire new customers for our business.

• **Continue executing land-and-expand**. Once customers sign initial contract and purchase orders, we can significantly shorten the sales cycle to win repeat orders from them as we don't have to repeat the technical and TCO validation periods. We have $169 million of backlog as of December 31, 2020, and we believe clear path to $1.

***

• **Expand our global channel relationships**. We intend to continue building partnerships to accelerate the development and production of our solutions. Lightning eMotors' strategic, engineering, production and technology partners augment our internal resources and we intend to leverage their capabilities and infrastructure to bring our solutions to market more quickly and to meet industry standards, without requiring us to invest substantial amounts of capital.

### *August 10, 2021 Forest River Announcement*

235.    On August 10, 2021, Lightning issued a press release titled, "Lightning eMotors and Forest River Inc. Reach Multiyear Agreement for up to $850M in Zero-Emission Bus

Technology Plus Charging Products and Services," which announced Lightning agreed to a deal with Forest River, a shuttle bus manufacturer, "to deliver up to 7,500 zero-emission Class 4 and Class 5 buses across the U.S. and Canada between 2021 and 2025." Defendant Reeser commented that the deal "has the potential to be the largest contract ever in the electric shuttle bus market":

> Lightning eMotors [...], a leading provider of specialty commercial electric vehicles for fleets, and Forest River, Inc., a Berkshire Hathaway company […], today announced they have entered into a strategic partnership agreement to deploy up to 7,500 zero-emission shuttle buses.
> The agreement, with a potential estimated value of up to $850 million, calls for Lightning eMotors to build fully electric powertrains and provide charging products, and services for Forest River over the next four and a half years. Lightning eMotors will manufacture the zero-emission-vehicle ("ZEV") powertrain systems at their 231,000 square foot facility in Loveland, Colorado and ship the powertrains to Forest River's factory in Goshen, Indiana, for final assembly of the Class 4 and 5 all-electric passenger buses. Forest River is the leading shuttle bus market leader in North America, with eight manufacturing buildings and more than 500,000 square feet of production space. The Elkhart, Indiana-based company has plans to dedicate 100,000 square feet to install Lightning eMotors' powertrains.
>
> "This has the potential to be the largest contract ever in the electric shuttle bus market, and we believe it will be the catalyst for other large commercial vehicle OEMs and fleets to accelerate their adoption of commercial electric vehicles," said Tim Reeser, CEO of Lightning eMotors. "Forest River's family of shuttle bus companies, including top name brands like Starcraft, Glaval, and Champion, maintain a dominant market position selling over 10,000 units per year in the Class 4 to 6 shuttle-bus space. Forest River's sales volumes allow us to provide a price point to their dealers and customers that results in a very compelling ROI. We believe this commitment from the largest shuttle bus manufacturer in the U.S. demonstrates that they believe that commercial vehicle customers are now demanding Lightning eMotors' zero-emission vehicles over ICE vehicles."

236.    The statements in ¶¶ 175-189, 211-217, and 221-235 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the PIPE and Notes financing significantly reduced the value of shareholders'' shares due to the large number of warrants outstanding; (2) the Defendants were not planning on staying with the Company for the represented three to five year window; (3) Legacy Lightning did not

have a supply chain strong enough to support ramped up production; (4) Legacy Lightning's supply chain and "vehicle performance" was not as reliable and not of the quality as Defendants represented;  (5) Legacy Lightning did not have the capacity to produce 500 vehicles a year; (6) in light of the foregoing, Legacy Lightning's financial projections were impossible to attain and patently unrealistic; and (7) Defendants were improperly interested in increasing their unjust compensation and their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge but False and Misleading Statements Persist

237.    On August 16, 2021, after the market closed, Lightning issued a press release announcing the Company's financial performance for 2Q 2021, which featured a net loss per share of $0.79 compared to a loss of $0.10 in the second quarter of 2020. Specifically, the press release stated, in relevant part:

> Gross loss was $1.1 million compared to $0.6 million in the prior-year period. Gross margin improved to -19.0% from -63.4% in the prior year period. The improvement in gross margin was largely driven by an increase in revenues, improved product mix, fixed cost leverage, and reductions in direct manufacturing cost through technology and process improvements.
>
> ***
>
> Loss from operations was $17.9 million, compared to $2.7 million during the same period in the prior year Net loss was $46.1 million, compared to net loss of $2.8 million during the prior-year period. Basic and diluted net loss per share was $0.79, compared to $0.10 in the prior year period. Adjusted loss from operations was $8.7 million, compared to $2.7 million during the same period in the prior year. Adjusted net loss was $12.6 million and $2.8 million during the same period in the prior year.

238.    Vitally, the press released revealed that Lightning was abandoning its previous guidance for the 2021 year, stating, in relevant part:

**Guidance**

81

Primarily because of unexpected chassis production disruptions and COVID related delays, Lightning is withdrawing its prior guidance for the 2021 year. Although the Company no longer expects to meet full year guidance, and is only providing guidance for one quarter out at this time, no orders have been cancelled and the Company expects to fulfill those orders in future quarters. Based on current business conditions, business trends and other factors, for the quarter ending September 30, 2021, the Company expects:

• Revenues of $4 million to $6 million.

• Vehicle and powertrain sales of 28 units to 40 units.

• Loss from operations of $12.5 million to $13.6 million.

• Adjusted loss from operations of $12 million to $13 million.

239.    The press release further revealed that none of the GigCapital3 members, Defendant Katz, Dinu, and Miotto, who were elected to the Board just months earlier, would seek re-election to the Board in October 2021. In just three months, and after considerable financial and operational struggles for the Company, the Defendants deserted the Company, and with them, their commitment to the shareholders of an "Mentor-Investor" model for three-to-five years.

240.    On this news, Lightning's price per share dropped 16.93%, or $1.63 per share, from $9.63 per share on August 16, 2021, to close at $8.00 per share on August 17, 2021.

241.    By October 2021, Lightning's stock price fell under $8.00 per share, but remained significantly artificially inflated.

242.    On October 15, 2021, the Federal Securities Action was filed in this Court, alleging that GigCapital3, Lightning, and certain officers and directors violated federal securities laws by misleading investors regarding Lightning's substantial supply chain issues and production capabilities, especially in light of Lightning's unfounded revenue and production projections.

243.    On November 15, 2021, Lightning revealed its third quarter of 2021 ("3Q 2021") financial performance, announcing that the Company sold 43 vehicles in 3Q 2021. Lightning also

projected fourth quarter of 2021 sales of "40 units to 60 units" and stated the Company had "pushed out over 60 expected vehicle sales from the fourth quarter into 2022 due to supply chain disruptions with our chassis and other component suppliers."

244.    Even with Lightning maintaining it would sell "100%" of its covered sales of 1,026 units as late as June 2021, the Company would come nowhere close to that figure. At the end of 2021, Lightning reported full-year "sales of 146 zero-emission vehicles," which constituted 14% of its alleged "100%" covered sales projected during the Merger. Likewise, Lightning reported revenue of $21 million, just 34% of the whopping $63 million projected during the Merger.

245.    Despite not even coming remotely close to what Lightning said it could and would do, the Board remained unapologetic, continuing to claim the Company had a pipeline of $1.3 billion and stated that "customers remain supportive, and we have not seen any order cancellations."

246.    But this was far from the truth, as certain of the Individual Defendants still claimed that the Company "have not seen any order cancellations," yet this was due to the Company fabricating customer orders, not due to customer unhappiness.

247.    On November 29, 2021, CompanyWeek, a company that profiles growth companies and calls itself "the voice of the modern manufacturing economy," interviewed Defendant Reeser. During the interview, Defendant Reeser admitted that Lightning's "supply chain has been largely made up of early-stage, small-volume manufacturers… And whether you're talking about small-scale fabricators or small scale manufacturers, it's just different. So we're pushing the supply chain up. And what we've found is, it's not as mature as everybody had hoped." He elaborated:

> No one else was building what [Tesla] needed in the quantities they needed it, so they had to go do it themselves. And the same thing has happened to us: We've had

to pull in our own fabrication or manufactured parts because we couldn't get them from other people in the scale we need them.

248.    By the end of 2021, Lightning's stock price per share fell to about $6.00 per share but remained artificially inflated due to the Company's unknown actual financial prospects for the coming year.

249.    Throughout 2022, the Lightning Board refused to furnish year-long financial guidance for the Company. However, the market would soon catch on to the truth about Lightning. On March 30, 2022, Lightning released its financial results for the 2021 Fiscal Year, reporting revenue of $21 million (just 1/3 of what was projected), 146 vehicles sold (compared to the stated 500), and costs of revenue rose by $15.2 million.

250.    By June 2022, the Company's stock price dove under $3.00 per share. On December 30, 2022, Lightning's price per share was $0.37.

***January 10, 2023 Press Release***

251.    On January 10, 2023, Lightning issued a press release, entitled, "Lightning eMotors Produces a Record 128 Vehicles and Powertrains During the Fourth Quarter of 2022," which announced the Company's financial performance for the fourth quarter of 2022. The press release quoted Defendant Reeser:

The fourth quarter capped a significant year of production for Lightning as we continued to demonstrate that we can grow capacity at a rate that we believe will allow us to reach gross margin positive in 2023. Our investments in 2022 in people, equipment, and processes have increased our production output, efficiency, and quality. Our fourth quarter output was the highest in our history by nearly 23%, and more than triple the quarterly production level from a year ago.

252.    The press release blamed low production on "battery supply issues" and Romeo Power Systems, Inc. "unexpectedly" reneging on a purported deal:

Fourth quarter revenue is expected to be approximately $4 million on sales of 31 vehicles and powertrain units, significantly lower than the expected range of $13

84

million to $18 million on sales of 100 to 130 units, primarily due to battery supply issues, demand shifting to 2023 as a result of the impact and timing of the new incentive programs starting in 2023, and fast-rising interest rates. Lightning lost significant sales volume during the fourth quarter because Romeo Power Systems, Inc. (a subsidiary of Nikola Corporation) unexpectedly notified Lightning that it would not honor its commitments to supply battery packs, or to provide further service or support, under its long-term supply agreement with Lightning.

***January 11, 2023 Press Release***

253.    On January 11, 2023, Lightning issued a press release, entitled, "Lightning eMotors and its CEO Tim Reeser Win 2023 Big Innovation Awards," which announced the Company won the Business Intelligent Group's 2023 BIG Innovation Awards. The press release characterized the Company as a business leader in the same category as IBM, Walgreens, and PepsiCo, as Defendant Reeser stated:

It's an honor to be recognized by Business Innovation Group for our legacy of bringing new ideas to life, and to join the ranks of such a distinguished group of current and previous winners, including IBM, Walgreens, WalkMe, ADP, PepsiCo Design & Innovation, Lucid and others… We know the work we're doing is innovative, but more than that, recognition like this further confirms that what we're doing is impacting the world in a positive way.

254.    The statements in ¶¶ 243-245, 247, and 251-253 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Lightning did not have a supply chain strong enough to support ramped up production; (2) Lightning's supply chain and vehicle performance was not as reliable and not of the quality as Defendants represented;  (3) Lightning did not have the capacity to produce 500 vehicles a year; and  (4) in light of the foregoing, Lightning's financial projections were impossible to attain and patently unrealistic. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**<u>The Truth Fully Emerges</u>**

255.    On March 13, 2023, the truth finally fully emerged when Lightning issued a press release that revealed the Company's 2022 financial results. The press release announced that Lightning produced just 374 units in 2022, or just 5% of the sales that were projected during the Merger. Likewise, the Company' revenue was $24 million, or just 7% of the projected revenue of $354 million that was projected during the Merger.

256.    Lightning's stock currently trades at $2.05, or approximately 80% less than its GigCapital3 IPO price of $10.00 per share.

**The Chancery Class Action Court Held That the GigCapital3 Board Lied to Investors**

257.    On August 4, 2021, Defendants Katz, Dinu, Miotto, Mikulsky, Betti-Berutto, and Wang were sued in the Delaware Chancery Court in a class action lawsuit that alleged claims of breach of fiduciary duty to GigCapital3 investors by pushing the Merger that advanced their own personal interests and misleading investors about the true nature of the Merger in order to receive the necessary shareholder votes to approve the Merger.

258.    On January 4, 2023, Vice Chancellor Wills denied Defendants Katz, Dinu, Miotto, Mikulsky, Betti-Berutto, and Wang's motion to dismiss, holding that "it is reasonably conceivable that the defendants breached [their fiduciary] duties by disloyally depriving public stockholders of information material to the redemption decision."

259.    The court's decision held, *inter alia*, that Defendants Katz, Dinu, Miotto, Mikulsky, Betti-Berutto, and Wang "deprived Gig3's public stockholders of an accurate portrayal of Lightning's financial health" and that the plaintiff sufficiently alleged that the Merger was subject to entire fairness review since it involved conflicts of interest, including that Defendants Katz, Dinu, Miotto, Mikulsky, Betti-Berutto, and Wang "diverged from public stockholders in the choice between a bad deal and a liquidation."

86

260.    Regarding the conflicts of interest, the court stated that "despite the plunge in [Lightning's] stock price since the merger, the [defendants' shares] were worth nearly $32.7 million when this litigation was filed." Additionally, the court stated the defendants further had "an interest in minimizing redemptions after the merger agreement was signed," which provided a basis for them to mislead investors to approve the Merger.

261.    The court's order confirmed the Overpayment Misconduct, holding that "public stockholders were left with shares of [Lightning] worth far less than the $10 per share redemption price."

## DAMAGES TO LIGHTNING

262.    As a direct and proximate result of the Individual Defendants' conduct, Lightning has lost and expended, and will continue to lose and expend, many millions of dollars.

263.    Such expenditures include, but are not limited to, legal fees associated with the Class Actions filed against the Company, any internal investigations, legal advisory, and other professional service fees, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

264.    Such expenditures further include the amount GigCapital3 overpaid for Legacy Lightning due to the problems with Legacy Lightning described herein.

265.    Such expenditures include payments to the Individual Defendants under the Incentive Plan, which was approved at least in part due to the false and misleading statements issued or caused to be issued by the Individual Defendants.

266.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including

bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

267.    As a direct and proximate result of the Individual Defendants' conduct, Lightning has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

268.    Plaintiffs bring this action derivatively and for the benefit of Lightning to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' and the Sponsor's breaches of their fiduciary duties as directors and/or officers of Lightning, waste of corporate assets, unjust enrichment, abuse of control, and/or violations of Section 14(a), as well as the aiding and abetting thereof.

269.    Lightning is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

270.    Plaintiffs are, and have continuously been at all relevant times, shareholders of Lightning. Plaintiffs will adequately and fairly represent the interests of Lightning in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

271.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

272.    A pre-suit demand on the Board of Lightning is futile and, therefore, excused. At
the time of filing of this action, the Board consists of the following seven individuals: Defendants
Fenwick-Smith, Coventry, Reeser, Jack, Senko, Tremblay (the "Director-Defendants"), and non-
party Wanda Jackson-Davis (together with the Director-Defendants, the "Directors"). Plaintiffs
need only to allege demand futility as to four of the seven Directors that were on the Board at the
time this action was commenced.

273.    Demand is excused as to all of the Director-Defendants because each one of them
faces, individually and collectively, a substantial likelihood of liability as a result of the scheme
they engaged in knowingly or recklessly to make and/or cause the Company to make false and
misleading statements and omissions of material facts which renders them unable to impartially
investigate the charges and decide whether to pursue action against themselves and the other
perpetrators of the scheme.

274.    In complete abdication of their fiduciary duties, the Director-Defendants either
knowingly or recklessly participated in making and/or causing the Company to make the materially
false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to
make the Company appear more profitable and attractive to investors. As a result of the foregoing,
the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability,
are not disinterested, and demand upon them is futile, and thus excused.

275.    Additional reasons that demand on Defendant Fenwick-Smith is futile follow.
Defendant Fenwick-Smith served as a director on Legacy Lightning's board and served as its
interim CFO from February 2020 to December 2020. He currently serves as Lightning's Executive
Chairman of the Board. He also currently serves as the chair of Lightning's Finance and Investment
Committee. Thus, as the Company admits, he is a non-independent director. The Company

provides Defendant Fenwick-Smith with his principal occupation, and he receives handsome compensation, including approximately $354,610 during the 2021 Fiscal Year and $207,291 during the 2022 Fiscal Year. Moreover, Defendant Fenwick-Smith received a $50,000 bonus approximately one month after the Merger closing, in June 2021. On July 13, 2021, he received 34,334 RSUs from the Company. Therefore, Defendant Fenwick-Smith has received substantial personal financial incentives to support the Merger and the Overpayment Misconduct. As the Company provides Defendant Fenwick-Smith with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Lightning. Defendant Fenwick-Smith was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. In addition, he solicited the Merger Proxy which contained false and misleading elements that contributed, *inter alia*, to shareholders approving the Merger, shareholders approving the PIPE and Notes financings, shareholders approving the Incentive Plan, and shareholders electing him to the Board, as well as electing Defendants Coventry, Reeser, Jack, Senko, and Tremblay to the Board. Such approvals allowed Defendant Fenwick-Smith to reap significant profits off his investments in the Company, which include the Founder Shares and Private Placement Units while effectuating the Overpayment Misconduct to the Company's detriment. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. Defendant Fenwick-Smith was also named as a defendant in the Federal Class Action. For these reasons, too, Defendant Fenwick-Smith breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

276.    Additional reasons that demand on Defendant Coventry is futile follow. Defendant Coventry has served as a Company director since the Merger closed. He also has served as a senior advisor to GigCapital Global, Defendant Katz's and Dinu's company, since the first quarter of 2020. He also currently serves as the chair of Lightning's Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Coventry receives handsome compensation from the Company, including $280,380 during the 2021 Fiscal Year and $170,936 during the 2022 Fiscal Year. On July 13, 2021, he received 34,334 RSUs from the Company. Defendant Coventry was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. In addition, he solicited the Merger Proxy which contained false and misleading elements that contributed, *inter alia*, to shareholders approving the Merger, shareholders approving the PIPE and Notes financings, shareholders approving the Incentive Plan, and shareholders electing him to the Board, as well as electing Defendants Fenwick-Smith, Senko, Jack, Reeser, and Tremblay to the Board. Such approvals allowed Defendant Coventry to reap significant profits off his investments in the Company, which include the Founder Shares and Private Placement Units while effectuating the Overpayment Misconduct to the Company's detriment. Indeed, through his senior advisor role at GigCapital, which is an affiliate of the Sponsor, which was founded and controlled by Defendant Katz, Defendant Coventry received significant financial benefits. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

For these reasons, too, Defendant Coventry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

277.    Additional reasons that demand on Defendant Reeser is futile follow. Defendant Reeser founded Legacy Lightning, serves as the Company's CEO, and has served as a Company director since the Merger closed. Thus, as the Company admits, he is a non-independent director. Defendant Reeser receives handsome compensation from the Company, including $3.2 million during the 2021 Fiscal Year and $2.2 million during the 2022 Fiscal Year. Moreover, Defendant Reeser received a $300,000 bonus upon the Merger closing. Additionally, since the Merger, Defendant Reeser's compensation has more than quadrupled; he only received $336,000 in compensation for the 2020 Fiscal Year. Therefore, Defendant Reeser has received substantial personal financial incentives to support the Merger and the Overpayment Misconduct. As the Company provides Defendant Reeser with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Lightning. Defendant Reeser was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, and personally drafted the spreadsheet that contained fabricated financial projections regarding Legacy Lightning's customer orders and production capabilities. In addition, he solicited the Merger Proxy which contained false and misleading elements that contributed, *inter alia*, to shareholders approving the Merger, shareholders approving the PIPE and Notes financings, shareholders approving the Incentive Plan, and shareholders electing him to the Board, as well as electing Defendants Fenwick-Smith, Coventry, Jack, Senko, and Tremblay to the Board. Such approvals

allowed Defendant Reeser to reap significant profits off his investments in the Company, which include the Founder Shares and Private Placement Units while effectuating the Overpayment Misconduct to the Company's detriment. As the Company's trusted highest officer and as a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme; and consciously disregarded his duties to protect corporate assets. Defendant Reeser was also named as a defendant in the Federal Class Action. For these reasons, too, Defendant Reeser breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

278.    Additional reasons that demand on Defendant Jack is futile follow. Defendant Jack has served as a Company director since October 7, 2021. He is also a member of the Audit Committee and Nominating and Corporate Governance Committee. Defendant Jack receives handsome compensation, including $163,291 during the 2021 Fiscal Year and $169,791 during the 2022 Fiscal Year. On October 7, 2021, he received 10,344 RSUs from the Company. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Jack breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

279.    Additional reasons that demand on Defendant Senko is futile follow. Defendant Senko served as a Company director since the Merger closed. He also currently serves as the chair

of Lightning's Audit Committee and as a member of the Finance & Investment Committee Defendant Senko receives handsome compensation from the Company, including $290,072 during the 2021 Fiscal Year and $184,791 during the 2022 Fiscal Year. On July 13, 2021, he received 34,334 RSUs from the Company. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Senko breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

280.    Additional reasons that demand on Defendant Tremblay is futile follow. Defendant Tremblay has served as a Company director since the Merger closed and as Lightning's Lead Independent Director since June 2021. Defendant Tremblay is also the chair of Lightning's Compensation Committee, a member of the Finance & Investment Committee, and a member of the Audit Committee. She receives handsome compensation, including $304,610 during the 2021 Fiscal Year and $199,061 during the 2022 Fiscal Year. On July 13, 2021, she received 34,334 RSUs from the Company. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements; consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme; and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Tremblay breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

281.    Additional reasons that demand on the Board is futile follow.

282.     Under the Incentive Plan, which is administered by the Compensation Committee and was approved in connection with the Merger Proxy (which contained materially false and misleading statements), each of the Director-Defendants is eligible to receive long-term equity-based compensation, the amount and terms of which are approved by the Compensation Committee.

283.     Each of the Director-Defendants has materially benefitted from the Incentive Plan. According to the 2022 Proxy Statement, non-employee directors who served after the closing of the Merger but were granted two RSUs of 17,167 shares each, for a cumulative amount of 34,334 shares under the Incentive Plan. The first batch of RSUs vest in three annual installments through May 2024 and the second batch of RSUs vest in quarterly installments through May 2022. Specifically, under the Incentive Plan, each of Defendant Coventry, Fenwick-Smith, Senko, and Tremblay received these grants of RSUs. Those amounts were several times what these Defendants were paid in fees earned or cash paid for the year. Likewise, Defendant Jack was granted an RSU grant covering 10,344 shares upon election to the Board on October 7, 2021 and another RSU grant covering an additional 8,332 shares vesting quarterly through May 2022.

284.     In July 2021, pursuant to the Incentive Plan, Defendant Reeser was granted 447,067 options, each vesting on May 6 of each year through 2025. On that same day, he was also granted 178,827 RSUs, each vesting on May 6 of each year through 2025.

285.     These awards were secured and disclosed before the Merger closed and were contingent on the Merger and related Overpayment Misconduct.

286.     Given their conflicted positions, the Director-Defendants are unlikely to take action against those individuals, including the Individual Defendants, who caused Company shareholders to approve a plan that the Director-Defendants have materially benefitted from and continue to

materially benefit from. Notably, following the closing of the Merger, the Directors approved, under the Incentive Plan, grants of RSUs with a fair market value of $3 million and $851,000, respectively, to the Company's CEO and CFO, both of whom were involved in the scheme to cause the Company to make materially false and misleading statements and omissions throughout the Relevant Period. Accordingly, the Director-Defendants are not independent or disinterested, and demand upon them is futile and, therefore, excused.

287.    Further, because Defendant Tremblay serves as the Chair of the Compensation Committee, the Director-Defendants are also unlikely to take action against Defendant Tremblay given her significant role in determining their compensation under the Incentive Plan.

288.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. Defendants Reeser and Fenwick-Smith have worked together as directors of Legacy Lightning for over 13 years, dating back to 2010. Additionally, Defendant Coventry works for Defendant Katz's company GigCapital Global, the entity that spawned the SPAC GigCapital3 that took Legacy Lightning public through the Merger, which provided personal financial benefits to each of the Director-Defendants. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

289.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct by failing to act ethically, failing to ensure the Company's disclosures were accurate, and failing to ensure the Company complied with applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

290.    Defendants Senko (as chairman), Jack, and Tremblay (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, and failing to adequately oversee the Company' disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

291.    Lightning has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Lightning any part of the damages Lightning suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

292.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

293.    The acts complained of herein constitute violations of fiduciary duties owed by Lightning's officers and directors, and these acts are incapable of ratification.

294.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Lightning. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Lightning, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

295.    If there is no directors' and officers' liability insurance, then the Directors will not cause Lightning to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

296.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

297.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

298.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

299.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

300.    The Individual Defendants caused the Merger Proxy to be false and misleading by failing to disclose, *inter alia*, that: (1) the PIPE and Notes financing significantly reduced the value of shareholders'' shares due to the large number of warrants outstanding; (2) the Defendants were not planning on staying with the Company for the represented three to five year window; (3) Legacy Lightning did not have a supply chain strong enough to support ramped up production; (4) Legacy Lightning's supply chain and "vehicle performance" was not as reliable and not of the quality as Defendants represented;  (5) Legacy Lightning did not have the capacity to produce 500 vehicles a year; (6) in light of the foregoing, Legacy Lightning's financial projections were impossible to attain and patently unrealistic; and (7) Defendants were improperly interested in increasing their unjust compensation and their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

301.    The Merger Proxy was false and misleading because, despite assertions to the contrary, Lightning's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the insider trading engaged in by six of the Individual Defendants.

302.    The Individual Defendants knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Merger Proxy, including but not limited to, the Merger and the Incentive Plan.

303.    The false and misleading elements of the Merger Proxy led shareholders to: (1) approve the Merger; (2) approve the PIPE and Notes financing; (3) approve the classification of

the Board; (4) approve the Incentive Plan, materially benefitting Defendants Fenwick-Smith, Katz, Reeser, Dinu, Senko, Miotto, Coventry, and Tremblay; and (3) elect Defendants Fenwick-Smith, Katz, Reeser, Dinu, Senko, Miotto, Coventry, and Tremblay to the Board.

304.    As a further result of the material misstatements and omissions in the Merger Proxy, Company shareholders were deprived of their right to make an informed decision in voting on the Merger, were deprived of their right to make an informed redemption decision regarding their GigCapital3 shares prior to the Merger, and were induced to accept inadequate consideration for the Merger.

305.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Merger Proxy.

306.    Plaintiffs on behalf of Lightning have no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Breach of Fiduciary Duties**

307.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

308.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lightning's business and affairs.

309.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

310.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lightning.

311.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Overpayment Misconduct.

312.    In further breach of their fiduciary duties, the Individual Defendants made false and misleading statements and omissions and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

313.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

314.    The Individual Defendants had actual or constructive knowledge of the Overpayment Misconduct and the materially false and misleading statements that enabled it, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

315.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

316.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

317.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lightning has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

318.    Plaintiffs on behalf of Lightning have no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

319.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

320.    The Individual Defendants' and the Sponsor's misconduct alleged herein constituted an abuse of their ability to control and influence Lightning, for which they are legally responsible.

321.    As a direct and proximate result of the Individual Defendants' and the Sponsor's abuse of control, Lightning has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

322.    Plaintiffs on behalf of Lightning have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

323.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

324.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and the Sponsor were unjustly enriched at the expense of, and to the detriment of, Lightning.

325.    The Individual Defendants and the Sponsor either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Lightning that was tied to the performance or artificially inflated valuation of Lightning, or received compensation or other payments that were unjust in light of the Individual Defendants' and the Sponsor's bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the Incentive Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations, and the millions of dollars that certain Defendants cashed out in connection with the close of the Merger.

326.    Plaintiffs, as shareholders and representatives of Lightning, seek restitution from the Individual Defendants and the Sponsor and seek an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants under the Incentive Plan, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and the Sponsor due to their wrongful conduct and breach of their fiduciary and contractual duties.

327.    Plaintiffs on behalf of Lightning have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

328.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

329.    The Individual Defendants and the Sponsor caused the Company to pay the Individual Defendants and the Sponsor excessive salaries and fees, to the detriment of the shareholders and the Company.

330.    The Individual Defendants caused the Company to engage in the Overpayment Misconduct, to the detriment of the GigCapital3's shareholders and the Company. As noted below, certain of the Defendants further aided and abetted this misconduct.

331.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants and the Sponsor have caused the Company to waste valuable corporate assets, including by, *inter alia*, by acquiring Legacy Lightning on terms unfavorable to GigCapital3 shareholders, while Legacy Lightning suffered from undisclosed issues and material risks. The Individual Defendants' and the Sponsor's misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend and settle unlawful actions and investigations by the SEC, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

332.    As a result of the waste of corporate assets, the Individual Defendants and the Sponsor are each liable to the Company.

333.    Plaintiffs on behalf of Lightning have no adequate remedy at law.

## SIXTH CLAIM

**Against the Individual Defendants and the Sponsor for Gross Mismanagement**

334.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

335.    By their actions alleged herein, the Individual Defendants and the Sponsor, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

336.    As a direct and proximate result of these Defendants' gross mismanagement and breaches of duty alleged herein, Lightning has sustained and will continue to sustain significant damages.

337.    As a result of the misconduct and breaches of duty alleged herein, these Defendants are liable to the Company.

338.    Plaintiffs on behalf of Lightning have no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Reeser, Covington, and Fenwick-Smith for Aiding and Abetting Breach of Fiduciary Duty**

339.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

340.    Defendants Reeser, Covington, and Fenwick-Smith aided and abetted the GigCapital3 Defendants who breached their fiduciary duties to the Company.

341.    Defendants Reeser's, Covington's, and Fenwick-Smith's misconduct resulted in continuous, connected, and ongoing harm to the Company.

342.    Specifically, these Individual Defendants promoted the Merger by issuing and/or consenting to the issuance of false and misleading statements concerning Legacy Lightning's

products, operations, and business prospects. Moreover, Defendants Reeser, Covington, and Fenwick-Smith controlled and operated Legacy Lightning, the Company's operational predecessor, and directly made statements and/or caused Legacy Lightning to jointly issue press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects. The Director-Defendants induced, through their support of the false and misleading Merger Proxy and other false statements, shareholders to vote in favor of the Merger and effectuate the Overpayment Misconduct to the Company's detriment.

343.    Defendants Reeser, Covington, and Fenwick-Smith are jointly and severally liable to the same extent as the GigCapital3 Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

344.    As a direct and proximate result of Reeser's, Covington's, and Fenwick-Smith's aiding and abetting of the GigCapital3 Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

345.    Plaintiffs on behalf of Lightning have no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Lightning, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lightning;

(c)    Determining and awarding to Lightning the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Lightning and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lightning and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Lightning to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Lightning restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 29, 2023        Respectfully submitted,

/s/____*Timothy Brown*_____
**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
            eitank@bgandg.com

*Counsel for Plaintiffs*

DocuSign Envelope ID: CE51F3D7-984B-4D51-81A3-0C48A24E9069

## <u>VERIFICATION</u>

I, Denish Bhavsar, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29 ___ day of August, 2023.



Denish Bhavsar

DocuSign Envelope ID: 959CBEC4-65CB-4A03-AC65-61DAAC2A13E0

## **VERIFICATION**

I, Samhita Gera, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29 day of August, 2023.

DocuSigned by:

CF385B035442498

Samhita Gera